Argued March 21, re-argued July 9, reversed as to Eugene Hospital and affirmed as to defendants Neal and Howard October 2, costs taxed October 23, rehearing denied November 13, 1928.

# HUGH HOLLAND v. EUGENE HOSPITAL ET AL.

(270 Pac. 784.)

For appellants there was a brief and oral argument by *Mr. Charles A. Hardy.*

For respondent there was a brief and oral argument by *Mr. H. E. Slattery.*

BEAN, J.—The motions for a nonsuit and motions for a directed verdict of course may be considered together for the reason that if there is any testimony found in the record introduced by defendants, which is favorable to plaintiff's case, it would be weighed in determining the motion for a nonsuit. This well-known rule needs no citation of authority.

■ Taking up the motions for a nonsuit and directed verdict in favor of defendant Eugene Hospital, a careful examination of the record fails to disclose that the hospital made any contract or engaged to perform any services for the plaintiff other than the ordinary services administered in any hospital.

It is not very material who called Dr. W. B. Neal to attend the case. His engagement was effected by the father of plaintiff, and the services of Dr. Neal were paid for by W. J. Holland, plaintiff's father. It would seem sufficient to show that the contract was made directly with Dr. Neal when we notice that in the settlement by the plaintiff's father with Dr. Neal for services and the payment therefor, Dr. Neal discounted his bill, apparently as he had rendered services for a member of the Holland family before that time. It is not shown that Dr. Neal had any authority to discount a bill of the Eugene Hospital.

It is not shown that there was any contractual relation between the Engene Hospital and its staff of physicians and surgeons, or that Dr. Neal was an officer of the corporation. For all that appears such staff may have been an honorary one. No complaint is made as to the accommodations of the hospital as such. The testimony in the case does not warrant a judgment against the Eugene Hospital, and such judgment is reversed.

■ The trial court held that the treatment of the boy's fractured leg by the doctors, as far as the treatment went, was proper as shown by the testimony on both sides of the case and therefore took from the jury all of the questions in relation to the treatment, except the allegations contained in the specifications "g" and "h" of the complaint, to the effect that after the discharge from the hospital May 9th, the defendants knew that the bone "was healing slipped and crooked, but failed to do anything to cause said leg to heal straight."

Notwithstanding the issues were in this manner narrowed, it seems necessary to give a short description of the treatment and results of the boy's leg. Taking the description given by Dr. Neal in his testimony, after the boy was brought to the hospital, an X-ray picture was taken of the fracture to ascertain the nature thereof. The ends of the bones had slipped by about three inches. The doctor put the boy in bed and then applied an apparatus called the "Beasley tongs," and weights to bring the leg into proper position. The leg was slung in an apparatus called the Hodgkin's splint.

Dr. Neal when he returned examined the X-ray picture that had been taken while he was away two weeks and reached the conclusion that the bones were

not in good apposition and that it was impossible to bring them into apposition. Apparently there was something in between the ends of the bones which kept them apart; that he informed the boy's father and mother that there should be an operation performed, which was had on April 22d, when the doctor found some muscle between the ends of the bone; that he performed a sliding bone graft and tied the bone graft in place with a catgut, sewed up the wound and placed a plaster cast upon the leg extending from the edge of the hip down over the leg and hip over the knee and down to the ankle, leaving a slit or window over the wound on the outside of the leg.

Twelve days after this operation Dr. Neal reached the conclusion that the bones were in apposition. May 9th the boy was sent home. He had been in the hospital a long time and was homesick. The whole leg was in a cast. He was brought in for the removal of the cast the last of June. Dr. Neal did not see the boy then. The next time he saw the boy was July 30th, when another X-ray picture was taken. The doctor found the leg very much bowed. He states he told the father that "at a future time that it would have to be worked on in order to straighten it." Dr. Neal was asked if he saw the picture taken April 17th and answered "Yes," and that the bone was not in proper position.

The boy was then on crutches. There was some disagreement as to the testimony from this on in regard to what was said and done as to the boy's condition. W. J. Holland, the boy's father, testified in part, that he had a talk with Dr. Howard during Dr. Neal's absence in regard to correcting the conditions of the boy's leg and Dr. Howard said several times to wait until Dr. Neal got back. Several X-rays

were taken of the bone at different dates. Mr. Holland states that he talked with the doctors several times about the condition of the boy's leg as shown by the X-rays. He told Dr. Howard in regard to the X-ray picture, "it did not look good to me. It looked like it was out of line and not in place too much. The picture shows it was almost slipped clear off."

Dr. Howard told him that the leg was not getting along right. Dr. Neal was gone six weeks and the leg left in that condition that length of time. Holland said he told Dr. Neal that Hugh, the boy, claimed the bone had slipped. And the doctor said "it must have been imagination; it could not slip in the cast." That Dr. Neal examined the X-ray taken July 30th and put forth no effort to straighten the leg. That we talked with the doctor and he said: "These ends, they showed the graft he put in is all good above the break and fast and he said that these sharp ends and such as that, would all slough off and it would be all right later, as good as—"

Holland further testified that the boy was returned again to the hospital and his leg was measured October 11th; that his right leg was about five inches shorter than the other. About six or eight weeks after the boy was taken home he was taken back to the hospital as directed by the doctor and the big cast was taken off and a shorter one from his knee to his hip was put on. He was then taken home and Dr. Neal told us when to bring him back, and when we brought him in the small cast was removed and the last X-ray picture taken on July 30, 1924. Holland testified that Dr. Neal did not tell him when the picture was taken July 30, 1924, "that there ought to be a further operation performed on the boy's leg."

Hugh Holland, plaintiff, as a witness, described his injury and part of the treatment and stated that he told Dr. Neal it seemed to him that the bone had slipped. "He could feel it." That he felt the end of the bone in the side of the dressing. There was a bump he could feel where the bone was; that his leg was then between five and five and one-half inches shorter than the other. That December 2, 1924, his leg was broken again a little below the original break, and on February 8, 1926, the thigh bone was broken the third time; that he had to be careful all the time.

Dr. F. M. Day, a specialist in surgery, who treated the boy's leg for the second and third break, testified as a witness for plaintiff to the effect that he examined the plaintiff's limbs and measured them, and at the first examination found about five inches shortening in the broken one. He found that the bone had a fracture and that he had union at the time he saw him with five inches shortening which was caused by misplacing of the fragments at the time, an overlapping of the fragments. That from the pictures, between April 25th and May 3d, he would say that the bone splint had moved; that it had slipped past each other instead of being end to end, had slipped past each other about one half an inch; "they lay side by side there." The ends are not in apposition. "Q. That is as to the bone splint? A. Yes."

The doctor was asked:

"Q. Suppose that condition prevailed and the boy testified he thought the bone slipped and they could feel these bumps and feel the end of the bone sticking out crooked, what would you say ought to be done, what would be the proper treatment in such a case

as that? A. Well, did he ever inform his physicians in charge of this condition?

"Q. And the physician was informed, as the evidence shows, what should have been done. A. Well, I think the physician in charge should have taken some X-ray pictures to determine the position of the bone.

Q. Well, the evidence shows that was not done. What would have been the proper treatment in the case, I tell you— A. And if the X-ray had been taken and showed a deformity, it should have been reduced by another operation or whatever was necessary to reduce the deformity."

Dr. Day stated that the proper treatment would have been to take an X-ray of the bone, "and if the X-ray had been taken and showed a deformity, it should have been reduced by another operation or whatever was necessary to reduce the deformity." That another effort should have been put forth to reduce the fracture and hold the bones in that position. In substance, Dr. Day approved the treatment given the boy by Drs. Neal and Howard as far as it went, but indicated that something should have been done to reduce the deformity.

Mrs. Nellie Holland, the mother of the plaintiff, who stayed at the hospital with Hugh, testified, in part, to the effect as follows: That she could feel the bone of the boy's limb through the slit in the cast. She stated that it was a very prominent bump; that the boy could not walk without a crutch.

Dr. R. B. Dilleheunt, a specialist in surgery, as a witness for defendants, testified approving the general treatment given the boy and the operation performed in April. The doctor explained that if there is delay in knitting of the bone in the first instance, then an operation had, then weight-bearing must be

deferred a long time or the new bone will gradually bend, not only under weight-bearing but the muscles spasms will cause the new bone to gradually bend at site of the knitting.

On cross-examination Dr. Dilleheunt testified, in part, to the effect as follows: That after the operation of a sliding bone graft and it has slipped and did not hold and the leg was bent, he would perform another operation or treat, and bend it back or wait with the avowed intention of correcting it later.

"Q. Suppose it bends? A. Well, then, if it bends, it bends, and—

"Q. Cannot there something be done to straighten it? A. Something best done if possible to prevent it. If it bends, you cannot straighten it after a certain time without surgery—butting through the bone and making a new fracture.

"Q. I know. But shouldn't that be done? A. It should be done, if there is deformity, always, some time."

Dr. Dilleheunt stated that the bone could slip in the cast and that the boy could feel it slip. Referring to the boy's leg, that if necessary to keep out the angle, he stated he would do something anyway to make it straight.

That the father called to see him about his boy with a bent leg as the result of a break and asked what should be done and he told him it should be straightened, that it would probably be necessary to make an open operation to straighten the bone at the place where it is bent.

"Q. I say, suppose it is not growing straight, and it is crooked. A. If you know it is crooked?

"Q. Yes. And it is early enough so it is not solidly united, then straighten it and put it in place with splint or something until it is solid."

Dr. Fred H. Thompson, chief surgeon of the State Industrial Accident Commission, a specialist in dealing with bones and joints, as a witness for defendants, explained the usual methods used in dealing with a broken femur. Referring to the condition of the boy's leg, as shown by the X-ray, taken July 30, 1924, the doctor stated there were two methods one might try—one by the manual fracture, which for reasons stated he did not think would have been advisable, and the other to wait until there was good bone to work on; that he did not believe it to be good practice to operate to correct the situation at that time. How long to wait would depend upon conditions; that to feel the ends of the bone through the slit "you must have a very marked angulation"; you might feel a swollen place or callous; it could bend but very little in the cast.

Mrs. Nellie Holland testified that she was present when the short cast was removed and an ambulatory splint put on; that the boy wore the splint constantly until they took it off at the hospital where it was left. Of course we took it off at night; it was fastened to his shoe.

The jury evidently believed that it was understood between the parties that the doctor, having been employed by the father to treat the boy's wounded limb, that he would administer to the boy's wants as long as he required the services of a surgeon without the father or anyone making a contract with the doctor each time he examined or treated the boy; that there was great necessity for surgical treatment of the limb and an entire lack of any treatment to remedy the defect after the last date mentioned. The question of what negligence there was under the evidence

in this case was for the jury: *Pratt* v. *Pond,* 42 Conn. 318.

◼ This court is not permitted to deal with the conflict in the evidence. Questions of fact where there is a dispute in regard thereto are for the jury. Therefore, we do not comment upon the evidence which is more favorable to the defendant Dr. Neal. The evidence tended to show that there was a deformity in the boy's limb which had been broken, that it was badly bowed, and that something ought to have been done by the surgeon to remedy the defect, and that Dr. Neal had knowledge of the condition and was conscious that a failure to take some measure to remedy the deformity would result in injury to plaintiff; that he knowingly failed to do anything to straighten the boy's leg or correct the defect therein on or after July 30, 1924, but instead stated that the leg would be all right. Defendant Dr. Neal makes an excuse for such failure and claims that he had no opportunity to remedy the condition. There is a conflict of evidence as to what was said by him at the time. The verdict of the jury excluded the doctor's excuse.

The testimony indicated there was on the part of Dr. Neal an absence of the care that was necessary under the circumstances of the case. There was sufficient evidence to take the case against defendant Neal to the jury, therefore, the trial court did not err in denying the motion for a nonsuit and motion for a directed verdict on behalf of defendant Neal.

◼ Error is predicated upon the submission by the trial court to the jury of the question of punitive damages. Defendants contend there was no evidence upon which to base exemplary damages.

The testimony indicated that after the boy was sent home from the hospital he was still under the doctor's care and the doctor directed when he should be brought in to him. The argument that the doctor had been paid and had no further opportunity to treat the boy thereafter is not in conformity with the evidence. It is true there is a dispute about the matter. There was testimony from which the jury might well conclude that when the parents brought the boy to the doctor July 30, 1924, and he told them in substance that the boy's leg would be all right, and did not do anything to correct the practically admitted deformity, and did not advise or suggest that anything be done to heal the defect, and did nothing in that line thereafter, and that the boy was again brought in to the doctor for treatment in October of that year; that the doctor was negligent and did not act in good faith in the matter, but with a desire to make the deformity of the leg less conspicuous.

The jury was warranted in finding that the defendant Neal was, under the circumstances of the case, negligent in failing to further treat the boy's injured limb.

In accordance with the mandate of the Constitution, Article VII, Section 3c, a verdict should not be set aside when there is any substantial competent evidence to support the same. When the judgment appealed from was such as should have been rendered in the case such judgment should be affirmed, notwithstanding any error committed during the trial. We are of opinion that the verdict of the jury and the judgment of the court were right regardless of the submission to the jury of the question of punitive damages. The judgment is not excessive.

■ The defendant Neal is not held for a mere failure, in the first instance, in the treatment given the boy's leg to cure it, and the ruling of the court eliminated that matter and left only the question of an entire lack of doing anything for the limb after a certain time: See *Hills* v. *Shaw,* 69 Or. 460 (137 Pac. 229); *Lehman* v. *Knott,* 100 Or. 59 (196 Pac. 476); *Rennewanz* v. *Dean,* 114 Or. 259, 264 (229 Pac. 372). The rule in regard to punitive damages is stated in 17 C. J., Section 284, page 986 et seq., cited by defendants, substantially as follows:

"Mere negligence in the absence of wantonness or circumstances of malice will not justify a recovery of exemplary damages. Such damages may be awarded only where the negligence complained of is gross. It is, however, frequently stated as a general rule that exemplary damages are recoverable where the injury received results from defendant's gross negligence or recklessness. While many cases announce this rule without definition of terms, it is by others explained as requiring negligence in such degree as to amount to wantonness and positive misconduct, manifesting a conscious disregard of the rights of others and a reckless indifference to consequences. * * "

And some cases hold that there must be wilful misconduct or such entire want of care as will raise the presumption of a conscious indifference to consequences. It must, it has been held, be shown that the person in default was conscious that injury would be a probable consequence of his negligence. It has been held that it is not necessary that defendant's acts should actually evince a wilful desire or intent to injure, nor that there should be an entire want of all care. "Punitive damages may be awarded for failure to perform a manifest duty as well as for

the negligent performance of an act which involves a breach of duty." 20 R. C. L., p. 9, § 7. See *Louisville & N. R. Co.* v. *Roth,* 130 Ky. 759 (114 S. W. 264); *Lake Shore, etc.,* v. *Prentice,* 147 U. S. 101 (37 L. Ed. 97, 13 Sup. Ct. Rep. 261).

"When a person from his knowledge of existing circumstances and conditions is conscious that his conduct will probably result in injury to others, and yet, with reckless indifference or disregard of the probable consequences, although he may have no intent to injure, does the act, or fails to do the act, and the injury results, there is liability for exemplary damages." *Whitmer* v. *El Paso etc. Co.,* 201 Fed. 193, 200 (119 C. C. A. 637); *Chesapeake etc. R. Co.* v. *John,* 155 Ky. 264 (159 S. W. 822, 50 L. R. A. (N. S.) 853); *Alabama Great Southern R. Co.* v. *Hill,* 93 Ala. 514 (9 South. 722, 30 Am. St. Rep. 65).

Gross neglect is either an individual wrong or such a reckless disregard of security and right as to imply bad faith. Wilful neglect is sometimes equivalent to individual wrong or a recklessness evidencing the absence of all care and precaution: 2 Bailey, Personal Injury (2 ed.), p. 1719, § 640.

The rule is stated in 6 Thompson's Commentaries on Negligence, page 254, Section 7175, as follows:

"Exemplary damages in addition to compensatory damages are recoverable against physicians where the injuries suffered by a patient are due to wilful misconduct in the treatment administered. If, however, there is no evidence from which malice on the part of the physician can be presumed, punitive damages should not be awarded."

In Volume 1 of the same work, page 20, Section 19, we read:

"No definite meaning has yet been given to the term 'gross negligence,' or any definition which will

not leave the whole question to the discretion of the tribunal that is to pass upon any particular case." Citing *Smith* v. *New York*, 24 N. Y. 241.

Mr. Justice Davis in writing the opinion of the court in the case *of Milwaukee etc. R. Co.* v. *Arms*, 91 U. S. 495 (23 L. Ed. 374), quoted in the last section mentioned of Thompson's Commentaries, said:

" 'Gross negligence' is a relative term. It is doubtless to be understood as meaning a greater want of care than is employed by the term 'ordinary negligence;' but, after all, it means the absence of the care that was necessary under the circumstances."

See *Hills* v. *Shaw*, 69 Or. 460 (137 Pac. 229); *Lehman* v. *Knott*, 100 Or. 59 (196 Pac. 476); *Sullivan* v. *Oregon R. & N. Co.*, 12 Or. 392 (7 Pac. 508, 53 Am. Rep. 364); *Emerson* v. *Lumbermen's Hospital Assn.*, 100 Or. 472 (198 Pac. 231); *Gill* v. *Selling & Margason*, 126 Or. 584 (267 Pac. 812).

■ There is much discussion in the brief touching on the treatment and condition of the boy's leg as shown by the X-ray pictures prior to the time the plaintiff left the hospital May 9, 1924. As all of these questions of negligence were taken from the jury by the trial court, we do not deem it necessary to refer to them at length, or at all, except as it may have a bearing upon the alleged negligence in the doctors failing to do anything to cause the leg to heal straight after the boy was discharged from the hospital. Where there is any substantial evidence sustaining the material allegations of the complaint, the case should be submitted to the jury: *Sherman-Clay Co.* v. *Buffum & Pendleton*, 91 Or. 352, 360 (179 Pac. 241); *Willetts* v. *Scudder*, 72 Or. 535, 542 (144 Pac. 87); *Powder Valley Bank* v. *Hudleson*, 74 Or. 191 (144 Pac. 494).

It is contended on behalf of defendant Neal that the submission of the case to the jury "left it entirely to the jury to speculate and without any evidence to support the proposition" that something further should have been done by the surgeon with the boy's leg.

The evidence in the case does not bear out this contention. While there was no attempt on the part of Dr. Day to enlarge upon the evidence, his testimony, if believed by the jury, warranted the finding that ordinary care required that something further should have been done by the surgeon in an attempt to straighten the boy's leg. The testimony of Dr. Dilleheunt and Dr. Thompson, to a certain extent, is subject to the same construction.

■ Defendant assigns error in the admission of testimony as to the condition of the boy's leg at the time of the trial for the reason of the two subsequent breaks of the boy's leg. Dr. F. M. Day treated the two last fractures. The testimony in the case was specifically confined to the fracture that was treated by Dr. Neal in a plain manner so that the jury could not have misunderstood the same. It was not intimated upon the trial that the treatment by Dr. Day caused any deformity of the leg. No claim of that kind was made. It is simply made a subject of argument after the trial and the case has been appealed. There was no error in this respect. The case was exceptionally free from error in the introduction of the evidence.

■ An exception to the ruling of the court was reserved in permitting evidence on behalf of plaintiff as to his habits and standing as a pupil in school. It was claimed by the plaintiff that the result of the negligence attributed to Dr. Neal prevented the boy

from having any vocation which required either standing or walking. It was therefore competent to admit testimony showing plaintiff's habits as bearing upon his industry: *Buffalo Creek Coal Min. Co. v. Hodges,* 30 Ky. Law, 346 (98 S. W. 274); *Hollifield v. Southern Bell Tel. & Tel. Co.,* 172 N. C. 714 (90 S. E. 996, 1001); *Forsyth* v. *Wallace,* 92 Wash. 452 (159 Pac. 696); *Cameron Mill & Elevator Co.* v. *Anderson,* 98 Tex. 156 (81 S. W. 282, 1 L. R. A. (N. S.) 198).

Defendant asserts in the brief that the charge of the court to the jury was contradictory and misleading and therefore defendant's requested instruction should have been given. We have read and re-read the charge to the jury and do not believe that it is subject to the general complaint made. The charge of the court, not considering the instruction as to punitive damages, plainly and fairly submitted the issues to the jury as to the defendant Neal.

The court directed a verdict in favor of defendant Howard as he was not treating the plaintiff at the time of the alleged negligence, which was submitted to the jury, and in that result we concur.

Defendants saved an exception to the overruling of an objection to hypothetical questions propounded to Dr. Day. (Trans., pp. 74–77.) That testimony related to X-ray pictures taken of the bone and the treatment given. Dr. Day answered "that is considered proper treatment for an ununited fracture." We do not find that defendant Neal was prejudiced by any error in this connection.

■ Defendants claim that lay witnesses were erroneously permitted to interpret the X-ray. Such testimony was excluded. The X-ray pictures were minutely explained by the surgeons. The father and

mother referred to the pictures in giving their testimony as one would refer to a map. We see no error in this respect. We refrain from printing the X-ray picture taken July 30, 1924, though that would make the case plainer than we can write.

Obeying the mandate of our Constitution, *supra,* the judgment is affirmed as against defendant Neal.

The judgment of dismissal as against Dr. M. G. Howard is affirmed.

The judgment against defendant Eugene Hospital is reversed and the case against it is dismissed.

> AFFIRMED AS TO DEFENDANTS NEAL AND M. G. HOWARD. REVERSED AS TO EUGENE HOSPITAL.

RAND, C. J., and BELT and ROSSMAN, JJ., concur in the result.