Argued June 5; affirmed July 1, 1947
# OLSON *v.* McATEE
(182 P. (2d) 979)

*Frank S. Senn,* of Portland (Senn, Recken & Recken, of Portland, and Farrens & Maxwell, of Klamath Falls, on brief) for appellant.

*L. Orth Sisemore* and *Edwin E. Driscoll,* both of Klamath Falls, for respondents.

Before ROSSMAN, Chief Justice, and LUSK, BAILEY, HAY and WINSLOW, Justices.

LUSK, J.

Harley Ray Olsen, a minor, by his guardian ad litem, sued Dr. Wayne McAtee, an osteopathic physician and surgeon, to recover damages for pain and suffering and time lost from school caused by the defendant's alleged malpractice in the treatment of a fracture of the left femur suffered by the plaintiff. His parents brought a similar action to recover the amount of medical, hospital and other expenses incurred, and damages for the lost earnings of their minor child, as the result of the defendant's alleged negligence. The cases were consolidated for trial and plaintiffs' judgments were entered based on the verdicts of a jury: In the case of the minor, for $3,500.00 compensatory damages and $3,000.00 exemplary damages; and, in the case of the parents, for $1,000.00. From these judgments the defendant has appealed.

As to each judgment, the principal ground of reversal relied upon by the defendant is the court's denial of his motions for nonsuit based upon the failure to prove negligence and resulting damage. The question of the sufficiency of the evidence of negligence is the same in each case, but, on the question whether the defendant's negligence was the proximate cause of damage, the right of the parents to recover depends, of course, on the proof of different facts from those which the minor child was required to establish.

The complaint in each case alleges that on September 8, 1945, the minor, Harley Ray Olsen, suffered a fracture of his left femur, and the defendant, a duly licensed osteopathic physician and surgeon, practicing at Klamath Falls, undertook to reduce the fracture and to administer subsequent treatment. It is charged that the defendant was guilty of negligence in the following particulars:

"1. In failing and neglecting to place the broken ends of the left femur of said Harley Ray Olsen in apposition;

(Specification 2 omitted because plaintiffs admit failure to prove.)

"3. Failing and neglecting to use usual and proper means to place the broken ends of said left femur in apposition;

"4. In failing and neglecting to give proper and adequate care and attention to the said Harley Ray Olsen after the application of plaster of Paris casts;

"5. In failing, neglecting and refusing to apply proper traction to the left leg of said Harley Ray Olsen before placing the same in a cast;

"6. In fixing the left leg of Harley Ray Olsen in a plaster of Paris cast before the broken ends of the left femur were in apposition;

"7. In improperly and negligently applying plaster of Paris casts to the left leg and body of Harley Ray Olsen in such a manner as to cause severe pressure sores and gangrene to develop on and in the person of him the said Harley Ray Olsen;

"8. In carelessly and heedlessly allowing the broken ends of the left femur of said Harley Ray Olsen to knit and unite without being in alignment or apposition."

We proceed to a review of the evidence, none of which is contradicted, as the defendant did not testify nor offer any evidence on his own behalf.

Mrs. Olsen, mother of Harley Ray Olsen then 8 years of age, testified that on Friday, September 8, 1945, she was informed that her son was hurt, went to him and found him partially conscious and his left leg badly swollen. She tried first to reach by telephone Dr. Earhart, a physician and surgeon, but, being unsuccessful, she telephoned to Dr. McAtee and told him that the boy had fallen out of a tree and that she thought his leg was broken because it was terribly swollen. The defendant directed her to bring the boy to the office. With the assistance of a neighbor, Mrs. Olsen lifted him into an automobile and drove him to the defendant's office where he was placed in a wheelchair and taken inside. The defendant did not help to remove the boy from the car to the chair, explaining that he was unable to do so "on account of his heart or something," as Mrs. Olsen stated it in her testimony. The boy was then placed on a plain table, and a nurse was called in who administered an anesthetic. The defendant straightened the leg and took an X-ray picture which showed that the left femur, the large bone between the hip and the knee, was broken, the ends overlapping and about one inch apart. The leg was badly swollen. The defendant then attempted to reduce the fracture. He administered more ether, and, while the nurse held the leg in position, he pulled on the leg. The boy was "lying loose" on the table. The defendant then applied a plaster of Paris cast which extended from the hip to the foot and took another picture which disclosed that the fragments of the bones still overlapped. Mrs. Olsen, who was shown the picture, spoke of this to the defendant, who told her that he would have to weight the leg down to bring the ends of the bone together and that he would

apply another cast later on. He directed the nurse to look after the boy "while he was gone on his trip," gave Mrs. Olsen some tablets "to make the boy rest," and called an ambulance to take him home. The defendant then left town on a trip, the purpose of which is not disclosed. He did not say when he would be back and did not see his patient again until Monday, September 18, which appears to have been two or three days after his return to Klamath Falls. In the meantime the nurse was in charge of the case.

On the following Wednesday, the nurse, with the help of Mr. Olsen, attached to the boy's foot and to the cast a mechanical appliance consisting of a board and a rope which passed through a pulley at the end of which a weight was hung, designed to cause traction which relaxes the muscles so that the bones will get in proper position. This weight was attached, not to the left leg but, to the cast, and the pull from it was on the cast. The nurse left instructions to add a pound a day to the weight. The next day, Thursday, a black spot about the size of a silver dollar appeared on the portion of the boy's heel not covered by the cast. The nurse was called. She cut off the cast up to the ankle and instructed Mrs. Olsen to massage the heel with olive oil, saying "that life would come back into it." The traction appliance was then re-applied as before.

Mrs. Olsen used the olive oil as directed, but the spot on the heel got worse. On Saturday she called the nurse, who advised the continued use of the tablets which the defendant had supplied. On Sunday the nurse telephoned Mrs. Olsen and said that the defendant would call the next morning (this being the second Monday after the accident). The defendant did call as promised and directed the use of additional weight

by attaching a bucket of sand to the end of the rope on the traction appliance. On Wednesday, in accordance with directions left her by defendant, Mrs. Olsen took the boy to the latter's office in an ambulance to have a new cast put on, which the defendant said was necessary because the swelling had gone down, thus causing the cast to become loose. The cast was removed, X-ray pictures were taken, and the boy put under ether while the doctor pulled on the injured leg. He was assisted by two nurses. The pictures showed that the fragments of bone still overlapped, though there was not so much of a gap between the ends. Another cast was applied which "extended up to the buttock and came up a little ways on the hip and it had a little band there to kind of hold it up; he said that band could not get out of position." The cast went as far down as the foot but not against the heel, which was still sore and black and caused the boy discomfort and pain. Another picture, taken after the second cast was applied, disclosed that the fragments of bone still overlapped. Mrs. Olsen discussed this with Dr. McAtee, who said that more weight was needed.

The boy was returned home in an ambulance, and Mrs. Olsen was instructed by the defendant to put 6 pounds of sand into the bucket and to increase the amount a pound every day. He gave her some more tablets to make him rest. The additional weight was applied in accordance with the defendant's directions. The boy, who had been suffering great pain during all of this time, got no relief, and on Friday his suffering increased and he could not sleep at night. Mrs. Olsen telephoned the doctor, who told her that it was a nervous condition. We quote from Mrs. Olsen's testi-

mony concerning what occurred on Saturday, two weeks after the day of the accident:

"Q. On Friday did the boy complain of any new sore spots?

"A. Right down on one buttock and his heel.

"Q. Did you make any inspection on the buttock or hip?

"A. Around two o'clock Saturday morning his father called me,—he was sitting by his bed, and he called me; the boy was suffering in such agony then, and I looked and inflammation was coming out of the edge of the cast.

"Q. Now when you say 'inflammation' do you mean pus?

"A. Pus and blood.

"Q. That was Friday night then, I take it, or some time early Saturday morning?

"A. Yes.

"Q. What did you do Saturday as soon as you had discovered this condition?

"A. As soon as their office opened I called.

"Q. What was the result of the call?

"A. I talked to the nurse and she said as soon as the doctor came in she would tell him. I told her the boy's condition.

"Q. Did the doctor call?

"A. No. I waited several hours and he did not call, and I called again, and he was not there or busy; would not come to the phone. So he called me then later on in the day and told me if I would soak the cast in water that I could pull it out.

"Q. In other words, pull it away from the sore developing on the buttock, is that correct?

"A. That is right.

"Q. About what time of the day was it the doctor contacted you then, Mrs. Olsen?

"A. About around one o'clock.

"Q. Did you follow his instructions as far as soaking the cast?

"A. Yes.

"Q. Were you able to give the boy any relief?

"A. No.

"Q. Did he continue to complain and apparently suffer from the effects of these sores in his leg?

"A. Yes; was very hysterical about it and he was suffering quite a bit.

"Q. Did you make a further attempt to try to get hold of the doctor again?

"A. Yes, after I had soaked the cast I called his home and was told he was not there, he had gone.

"Q. Did they make any report to you as to when you would be able to get in contact with him or anything of the sort?

"A. No.

"Q. But that he was not available at least on that day; is that correct?

"A. Yes.

"Q. What did you do then, Mrs. Olsen?

"A. I called his nurse and told her the doctor had not come to see the boy and I was going to call in another doctor.

"Q. Did you call another doctor?

"A. Yes, I called Dr. Earhart."

Mrs. Olsen gave Dr. Earhart the history of the case and at his direction took the boy to the hospital where the cast was cut away from the buttock. This afforded him some relief. Mr. Olsen testified that after the cast was pulled loose "you could take a lead pencil and put it in the crease where it cut into his skin."

On the following day Dr. Earhart took an X-ray picture of the injured leg which showed the fragments of the bone still overlapped and beginning to knit.

He determined that an operation was necessary. The next day, September 25th, Dr. Earhart, assisted by Dr. Lamb, performed what is referred to as the "open operation" method of reducing a fracture. They made an incision in the thigh in the area of the fracture, cut away the callous or tough gristle,—the beginning of bone formation—so as to free the ends of the bone and, with the aid of an instrument called a bone-skid, got the ends together and in apposition. It was an oblique fracture, and to hold the ends in place a metal band or clamp was put on so as to encircle the bone at the point of union and screws were inserted to hold it firmly in place. A cast was then applied which extended the full way around both hips. The boy remained in the hospital until September 29th. Thereafter his pain and suffering began to subside.

In October, about two weeks later, infection developed in the area of the incision and he was returned to the hospital where he was put under an anesthetic and a rubber tube inserted in the wound for drainage purposes. He was in the hospital this time for about five weeks. On January 5, 1946, the cast was removed at the hospital where it was necessary for him to remain five days. In February, 1946, on the advice of a Dr. Currin, Mr. and Mrs. Olsen took Harley to Portland to consult an orthopedic specialist. At the Emanuel Hospital in Portland Dr. Begg performed what Mrs. Olsen described in her testimony as "another major operation", at the place where the incision was made. There is no other evidence of the nature of this operation.

The boy re-entered school at the fall term of 1946.

During practically all the time that Harley was under the defendant's care he suffered very severe

pain, according to the testimony of his parents. He got practically no relief from the tablets. His temperature was never taken either by the defendant or the nurse.

The result obtained by the operation performed by Dr. Earhart and Dr. Lamb was good. The femur was put in perfect alignment and there is no evidence of permanent injury and none is claimed.

We come now to the only medical testimony in the case, that given by Dr. Earhart and Dr. Lamb.

Both witnesses testified that the operation they performed was made necessary by the soft callous formation which had developed between the fragments of bone. According to Dr. Earhart, the callous formation is "a blood clot into which the lime salts are deposited and the early attempt of nature to heel that fracture by new bone formation"; it is "one step in the knitting of the bone". Both the physicians agree that if the operation had not been performed the bone would have grown together in the overlapping position shown in the X-ray and the leg would have been crooked and shortened. Dr. Earhart testified that the fracture could not be reduced by traction after tissue had formed to the extent that it had at the time that he first saw it. The jury could have found from the evidence that the defendant was attempting to reduce this fracture by traction on the day before Dr. Earhart first saw the patient and examined the X-ray pictures which disclosed that the bone had begun to knit. The evidence of the pictures was confirmed when the incision was made and the bone was exposed. Defendant's counsel seek to dispute the effect of this evidence by calling attention to Dr. Lamb's testimony that, generally speaking, it would take at least three weeks for the beginning of union, but Dr. Lamb also testified that

the time varied with the individual. In the case of Harley Ray Olsen it is shown as a fact that union had commenced at the end of two weeks.

Dr. Lamb testified that a cast such as that used by the defendant, which came only to the hip at the top, would not hold the femur in position, assuming that it had been so placed, that it would permit the leg to rotate and in result would be very painful to the patient, as the jagged ends of the bone would cut into the muscles and soft tissue.

Dr. Lamb also testified that it was not proper practice to immobilize the broken ends of the femur when they are not in apposition and are overlapping, for such a length of time as to allow them to knit in that position. The evidence shows that that is what the defendant did.

With reference to the method used by the defendant to reduce the fracture, Dr. Earhart testified:

"Q. Doctor, assuming, under the same set of circumstances I gave you, with that added circumstance if the boy at that time was under an anesthetic, ether, could the fracture be reduced by pulling his leg, the boy not being fastened to the table or held?

"A. Not wishing to be understood,—one man who was strong enough, on a child, might use one hand on the hip and the other down on the leg, and pull hard enough, creating traction here, and counteraction with the other hand here (indicating); but if it is just a case of pulling on one foot, there would not be enough traction to stretch those muscles out. There is considerable muscular resistance whenever there is anesthesia."

Dr. Lamb testified that it is poor practice to apply a cast within one or two hours after a fracture of the

femur for the purpose of effecting a cure, explaining that it may be done to hold the leg until the swelling disappears, then removing it and proceeding to reduce the fracture, and that it is also done as a protective measure to prevent severe pain when it is necessary to transport the patient a considerable distance to a hospital. He said that where swelling has developed it is impossible to get the bones in apposition immediately after the fracture; that in such a case the proper procedure is to "put on a plaster cast and hold that thing steady until, in the course of ten days, nature will absorb the swelling and we can go on and use the closed reduction method by traction." Finally, Dr. Lamb, in answer to a hypothetical question which embraced practically the entire history of the case while Harley was a patient of the defendant, stated that the course pursued by the defendant "does not conform to any school of medicine."

In our opinion the evidence shows negligence on the part of the defendant which was the proximate cause of pain and suffering endured by the minor plaintiff. Pain and suffering are a proper element of damage. *Hively v. Higgs,* 120 Or. 588, 593, 253 P. 363, 53 A. L. R. 1052. The evidence respecting the improperly applied cast which permitted the fragments of bone to move and tear into the muscles and soft tissues of the boy's leg, causing prolonged and severe pain, is sufficient of itself to support the verdict. The circuit court did not err in denying the motion for nonsuit in the case of Harley Ray Olsen.

We consider next the sufficiency of the evidence in the case brought by H. L. Olsen and Cecil Olsen. What has been said above disposes of defendant's contention that there is no evidence of negligence, and

the discussion will be confined to the claim that there is no proof that defendant's negligence was the proximate cause of damage to the plaintiffs.

The damages which plaintiffs seek to recover are the medical and hospital expenses of the operation performed by Drs. Earhart and Lamb, the hospital expenses incurred in October, 1945, when infection developed, in January when the cast was removed, and in February when the operation was performed in Portland, and certain other incidental expenses, and for the boy's lost services.

■ To make a case, it was incumbent upon the plaintiffs to establish by substantial evidence, not speculative in character, not only that the defendant was negligent, but that without such negligence these expenses would not have been incurred and the boy's services would not have been lost. *Lippold v. Kidd,* 126 Or. 160, 170, 269 P. 210, 59 A. L. R. 875; *Guisti v. Weston Co.,* 165 Or. 525, 535, 108 P. (2d) 1010. The boy had sustained a serious injury, for the ordinary consequences of which, of course, the defendant is not to be held responsible; and the question, therefore, is whether there is any evidence to support a finding that the operation performed and the expenses incident thereto would not have been necessary in any event, and regardless of the defendant's negligent treatment.

It is shown by the medical testimony that the femur is one of the largest bones in the body and one of the hardest to heal, that a fracture of the femur is serious because the heavy thigh muscle that contracts and expands makes reduction difficult, and because there are no other bones to anchor to as in the case of a fracture below the knee. An oblique fracture, such as that in this case, is one of the most difficult to keep

in position by the closed method. There are two methods of reduction generally in use by surgeons: The closed method by manual traction and the application of a cast—and sometimes traction in addition to the cast; and the open operation procedure, both of which have been described. The latter is employed sometimes because the closed reduction method is not producing satisfactory results, and, in some fractures, it is the best procedure at the start. The cast and traction method is the best if it will get the bone in apposition, because it is less expensive.

The defendant used one of the recognized methods of reducing the fracture, and it is not an unreasonable inference that, had he exercised the requisite care and skill, he would have got a good result. There is no evidence to the contrary. The case is, therefore, not governed by *Lippold v. Kidd,* supra, and other like authorities cited by defendant. The jury was warranted in finding—indeed the finding is practically compelled by uncontradicted medical testimony—that it was the negligence of the defendant in keeping the leg in a cast until the bone had begun to knit which made the operation imperative. Therefore, all expense incidental to and consequential upon that operation, in excess of what would have been incurred had the defendant measured up to his responsibility as a physician, constitutes damage to the plaintiffs proximately caused by the defendant's negligence, and for which they are entitled to be compensated.

The evidence shows the amount of expenses actually incurred by the plaintiffs, and there is also evidence, supplied by Dr. Lamb on cross-examination, of the usual physician's fee and hospital expenses where the closed reduction method is used in the case

of a fractured femur, and, consequently, there is adequate basis in the evidence for ascertaining the amount of the damages; and, as there is proof that the damage flowed from the defendant's negligence, the court was right in denying the motion for a nonsuit.

The defendant asserts that the verdict is "outrageous." He attacks particularly the evidence of the hospital expense in October and November, 1945, because that was occasioned by the infection that developed after the operation, and testimony is referred to that infection sometimes results from such an operation. But no motion was made to withdraw that particular item of damage from the jury's consideration. There was a motion to withdraw all the evidence as to hospital expenditures. This was properly denied, and no assignment of error calls the ruling in question. The defendant has not assigned error on any ruling of the court on the admission of evidence of damage. His criticisms of the size of the verdict and of particular items of damage proven are merely indulged in as a part of the argument on the sufficiency of the evidence to take the case to the jury.

■ As to the contention about the hospitalization in October and November, it may be conceded that infection in the area of the incision made this necessary, and that the infection resulted from the operation. But the operation was made necessary by the defendant's negligence, and the infection, as a consequence of the operation, goes back in the chain of causation to that negligence, and the resulting expense was a relevant fact to be shown in proving plaintiffs' damages.

■ Again, it is argued that the boy's period of recovery was not prolonged by anything that the defend-

ant did or failed to do, for the medical testimony is to the effect that it ordinarily requires about four to six months for recovery from a fractured femur, and in this case recovery was complete in about six months. It is further said that no damage could be suffered by parents for the loss of services of an eight-year old boy who is merely temporarily incapacitated for a period of six months. All this may be true, but no motion was made at the trial to withdraw this issue from the consideration of the jury, and there is nothing in this regard for this court to pass upon.

■ The only question presented by the record and defendant's brief on this phase of the case is the propriety of the court's ruling on the motion for a judgment of involuntary nonsuit. As we have said, there was no error in the denial of the motion. The damages allowed by the jury may possibly be in excess of any amount which the evidence supports. That question was presented to the trial court in a motion for a new trial, which was denied. The ruling has not been brought here for review by an assignment of error, is not mentioned in defendant's brief, and the question is not presented by any mode known to our procedure, and is not before us. On the whole record we cannot say that the verdict was unjust.

■ In the case of Harley Ray Olsen the defendant asserts that the court erred in submitting to the jury the question of punitive damages. The rule on this subject is thus stated in *Rennewanz v. Dean,* 114 Or. 259, 266, 229 P. 372, a malpractice case in which an award of punitive damages was upheld:

"* * * The authorities, however, are numerous that punitive damages will also be awarded where the conduct of the defendant is reckless, like as if he knew the danger impending to the plaintiff, but

proceeded with manifest indifference to the result. Likewise, such damages are awarded where the defendant is grossly negligent.''

See also *Holland v. Eugene Hospital, et al.,* 127 Or. 256, 270 P. 784.

■ The evidence of the defendant's treatment of the fracture and his neglect of the case has been set forth at length and in detail in this opinion. Considering the character of the defendant's profession and the obligations it imposes, we think it needs no argument to support the conclusion that on this evidence, unexplained as it is by the defendant, the jury was warranted in finding him guilty of gross negligence and including in the verdict an award of punitive damages.

■ The defendant also complains of an instruction given by the court which would authorize the jury to find the defendant responsible for the negligence of the nurse whom he left in charge of the case. It is argued that the instruction is abstract, that the complaint does not allege negligence on the part of the nurse, and that there is no evidence that she was negligent. We think there is evidence of such negligence for which the defendant would be liable under the doctrine of *respondeat superior,* 48 C. J., Physicians and Surgeons, 1137, § 143, and that when it is sought to hold a defendant for a wrong committed by his servant, it is sufficient to allege that the defendant committed the act without mentioning the servant. 39 C. J., Master and Servant, 1352, § 156. But, regardless of this, it is well settled that the giving of an abstract instruction is cause for reversal only when it is reasonably apparent that the jury has been misled. *State v. Weston,* 155 Or. 556, 581, 64 P. (2d) 536, 108 A. L. R. 1402. We think that in this case the jury could not

possibly have been misled by the instruction complained of, because proof of the negligence of the defendant himself was so clear and strong as to amount nearly to demonstration.

It follows from the foregoing that the judgment in each case should be, and it is, affirmed.