Argued December 1, 1965, reargued September 8, reversed and
remanded December 27, 1966

# McELWAIN ET UX v. GEORGIA-PACIFIC
# CORPORATION
### 421 P. 2d 957

*Nels Peterson,* Portland, argued and reargued the

cause for appellants. With him on the briefs were Gerald H. Robinson, Nick Chaivoe and Donald H. Londer, Portland.

*Clifford N. Carlsen,* Portland, argued and reargued the cause for respondent. With him on the brief were King, Miller, Anderson, Nash & Yerke, Fredric A. Yerke, Jr., Jean P. Lowman, Portland, and William T. Hollen, Newport.

Before McAllister, Chief Justice, and Perry, Sloan, O'Connell, Goodwin, Denecke and Holman, Justices.

McALLISTER, C. J.

This is an action brought by the plaintiffs, Ross and Edith McElwain, against the defendant, Georgia-Pacific Corporation, to recover both compensatory and punitive damages for injury to plaintiffs' real property caused by the operation of defendant's paper mill in Toledo.

Plaintiffs own two and one-half acres of land, improved with a dwelling house and garage, located directly east of defendant's mill. The complaint alleged that since defendant commenced operation of its plant on or about January 1, 1958, plaintiffs' property was damaged by "certain noxious and toxic gases, fumes and smoke and particles" blown and deposited thereon by defendant's mill. It is further alleged that the effluents from defendant's mill killed the trees and vegetation on plaintiffs' property and otherwise depreciated the value of the property. Plaintiffs prayed for $35,000 in compensatory damages and $20,000 in punitive damages. The court withdrew the issue of punitive damages, and the jury returned a verdict of $2,000, compensatory damages. The plaintiffs appeal.

Plaintiffs assign as error the withdrawal by the trial court of plaintiffs' claim for punitive damages.

 Although this court has on occasion indulged in the dictum that punitive damages are not "favored in the law," it has, nevertheless, uniformly sanctioned the recovery of punitive damages whenever there was evidence of a wrongful act done intentionally, with knowledge that it would cause harm to a particular person or persons. Hodel, *The Doctrine of Exemplary Damages in Oregon,* 44 Or L Rev 175 (1965). Malice is the term most frequently used in our decisions to define a state of mind that will justify the imposition of punitive damages. Malice, as a basis for punitive damages, signifies nothing more than a wrongful act done intentionally, without just cause or excuse. *Syfert v. Solomon,* 95 Cal App 228, 272 P 810 (1928); *Wendelken v. Stone,* 88 NJL 267, 86 A 376 (1913); *Beetschen v. Shell Pipe Line Corp.* (Mo App) 248 SW2d 66 (1952). The intentional disregard of the interest of another is the equivalent of legal malice, and justifies punitive damages for trespass. *Allison v. Hodo,* 84 Ga App 790, 67 SE2d 606, 608 (1951). Where there is proof of an intentional, unjustifiable infliction of harm with deliberate disregard of the social consequences, the question of award of punitive damages is for the jury. *Vaughn v. Missouri Power & Light Co.,* (Mo App) 89 SW2d 699 (1935); *Funk v. H. S. Kerbaugh,* 222 Pa 18, 70 A 953, 22 LRA, NS, 296 (1908); *Yazoo & M. V. R. Co. v. Sanders,* 87 Miss 607, 40 S 163, 3 LRA, NS, 1119 (1906); *McIvor v. Mercer-Fraser Co.,* 76 Cal App2d 247, 172 P2d 758 (1946); *Louisville & N. R. Co. v. Bolton,* 18 Ky L 824, 38 SW 498 (1897); *Krebs v. Bambrick Bros. Const. Co.,* 144 Mo A 649, 129 SW 425 (1910).

It is abundantly clear from the record that defendant knew when it decided to construct its kraft mill in Toledo, that there was danger, if not a probability, that the mill would cause damage to adjoining property. This is disclosed by defendant's evidence that the plans for the mill included, as an integral part thereof, certain air pollution control devices designed to minimize the damage caused by the mill to surrounding property.

The record is equally clear that, almost from the day it began to operate, the effluents from defendant's mill were a source of concern to the State Board of Health, and its successor, the State Sanitary Authority, and to the owners of the adjacent property. Although the trial judge excluded most of the relevant evidence offered by plaintiffs to show the extent and nature of the effluents deposited on their property, the defendant's evidence discloses that it was required to keep and furnish records to the state regulating authorities concerning the fallout of effluents on the neighboring properties. Defendant received correspondence from the State Sanitary Authority concerning the damage caused by the effluents from its mill, and defendant's representatives testified at a hearing conducted by the Authority.

When defendant's mill was constructed the following air control equipment was installed therein:

| Date | Equipment | Function |
|---|---|---|
| 12/57 | No. 1 Electrostatic Precipitator | Remove dust from Recovery Furnace gases |
| 12/57 | No. 1 Peabody Scrubber | Remove dust from kiln gases |
| 12/57 | No. 1 Black Liquor Oxidation Tower | Stabilize liquor and minimize release of odors |

| Date | Equipment | Function |
|------|-----------|----------|
| 12/57 | Blow Heat Accumulator | Condense all digester gases so that non-condensables can be vented to oxidation tower for re-absorption |

In about June, 1960 the capacity of defendant's mill was increased from about 240 tons to 600 tons of paper per day. In connection with that expansion program two additional pieces of pollution control equipment were installed, as follows:

| | | |
|------|-----------|----------|
| 3/60 | No. 2 Peabody Scrubber | Remove dust from kiln gases |
| 5/60 | No. 2 Electrostatic Precipitator | Remove dust from Recovery Furnace gases |

In 1961 a Turpentine Recovery System was installed "to remove turpentine vapors," and in 1962 two Lagoon Surface Aerators and other oxidation equipment was installed to "reduce odor release from liquid streams." According to defendant the equipment described above is all the pollution control equipment which had been installed prior to the filing of the complaint in this action. There is no contention by defendant that the fallout of effluents on plaintiffs' property was eliminated or even alleviated by its efforts at control.

■ Defendant contends that it should not be liable for punitive damages if it did everything reasonably possible to eliminate or minimize the damage caused by its mill to the neighboring properties. We need not pause to determine whether there is merit in defendant's contention. It is sufficient to call attention to the substantial evidence from which the jury could have found that during the period involved in this action the defendant had not done everything reason-

ably possible to eliminate or minimize the damage to adjoining properties by its mill. That evidence was introduced by defendant itself. Its expert in charge of its pollution control program, Dr. Taylor, testified that between the filing of plaintiffs' complaint and the time of the trial the defendant had installed or was in process of installing the following additional pollution control equipment:

| 4/63 | Rebuild #1 Precipitator | Replace internal units and increase electrical capacity |
|---|---|---|
| 11/63 | No. 2 Black Liquor Oxidation System | Stabilize liquor and minimize release of odors |
| 3/64 | #3 Electrostatic Precipitator | Remove dust from Recovery furnace gases (Expansion) |
| 3/64 | #3 Peabody Scrubber | Remove dust from kiln gases (Expansion) |
| 3/64 | 290-ft. Stack | High level discharge of all three recovery furnace gases |
| 4 to 6/64 | Three wet scrubber systems for three Recovery Furnaces | Wash residual salt from recovery furnace gases and reduce odor |
| 5/64 | Relocate #2 stack at kilns | High level discharge of kiln gases |

Dr. Taylor testified that the increase in the height of the stack and the other controls were designed to minimize particulate fallout. The following is quoted from his testimony:

"Q I think one of the last questions you were asked, you said that there will be a significant reduction as a result of installing the new scrubbers

and stacks. I think that is one of the last questions asked you and that was your answer.

"A Yes.

"Q But, until they are installed, there is escaping particulates from the plant in considerable quantities, is there not?

"A We have discussed this before that we do have particulates and they have been escaping to a degree since we started up, we admit this."

Except as to the three "wet scrubbers" installed from April to June, 1964, there is no contention that the additional controls could not have been installed either (a) when the mill was built, or (b) as soon as it became apparent that the mill pollution was damaging the adjoining properties. It was admitted that the increase of the stack height to 290 feet would decrease the fallout on plaintiffs' property. The failure to increase the stack height earlier is not explained.

The evidence also discloses that the defendant's efforts to control pollution were influenced by the cost factor. Dr. Taylor testified as follows:

"Q On the question of adequacy of the control, did the element of cost enter into consideration by Georgia-Pacific Corporation?

"A In any of our considerations in a corporation, we take into consideration cost, yes."

There was an abundance of evidence sufficient by any standard to support an award of punitive damages. We conclude that the trial court erred in withdrawing the issue of punitive damages from the jury.

The questions raised by plaintiffs' other assignments of error are not likely to recur on retrial and need not be considered in this opinion. We need only to say that if any instructions concerning trespass by

industrial effluents are given, they should conform to our opinion in *Martin v. Reynolds Metals Co.*, 221 Or 86, 342 P2d 790 (1959), cert. den. 362 US 918, 80 S Ct 672, 4 L ed 2d 739 (1960).

The case is remanded for a new trial.

DENECKE, J., dissenting.

The majority holds that the fact the defendant did not install all the possible air pollution controls at the beginning of the plant's operation is evidence defendant did not do everything reasonably possible to eliminate or minimize the damage to plaintiffs and, therefore, the jury may punish the defendant by awarding plaintiffs punitive damages. I disagree that the facts permit this inference.

As an example of defendant's lack of due diligence the majority points out that the stack was only increased in height in 1964. (It is now the tallest or one of the tallest stacks in the Northwest.) The majority states that the defendant's failure to increase the stack at an earlier date is unexplained. However, Dr. Taylor was asked: "Why wasn't the 290 foot stack installed earlier?" He answered: "It was our opinion that the original control devices would be adequate to take care of the situation and they would not be needed, and the very tall stack would not be needed." Dr. Taylor testified with regard to the whole control system: "I felt they were adequate, but it was at least my desire to do a better job. I felt there was a possibility of developing means of doing a job even though this was the accepted method of doing it in the industry. I felt personally that we could do a better job. That was why we had the research and came up with an answer."

Plaintiffs' witness Dr. Hatchard, head of the air quality control section of the Oregon State Sanitary Authority, was questioned and testified as follows:

"Q This matter of controlling emissions from a Kraft paper mill, is that something where you go out and pick up a piece of equipment that is readily available and that solves the problem right there?

"A I wish it were. It's not quite the case.

"Q Would you say it is pretty much trial and error process where you try this and that hoping that you can arrive at some solution?

"A It is usually the case where an approach is worked in a similar mill and though each mill is somewhat different, it has to be designed to get— balanced and all of the various extremes within the mill. It has to be thoroughly studied, tested, and often smaller test runs have to be made to know whether it will do what the reductions or changes are that are needed.

"Mr. Yerke: Nothing further, your Honor.

"Questions by Mr. Peterson:

"Q Were those ever done in the Georgia-Pacific plant to your knowledge?

"A Yes, through our staff knowledge, yes."

There was no witness who expressed an opinion that a reasonably prudent mill operator would have proceeded any differently than did the defendant. It appears from the testimony of both parties that the control of air pollution from a Kraft mill is as difficult for lay understanding as some portions of the practice of medicine. As in medical malpractice cases, it is appropriate to require opinion testimony whether the defendant has or has not observed the applicable standard of care. As in a medical malpractice case, I do not believe it is evidence of negligence merely

to show that the defendant used procedures later which he could have used initially. The question is, did reasonable prudence require that such procedures be used initially? There was no testimony that it did.

My principal difference with the majority, however, is concerning the legal basis for permitting the jury, in its discretion, to award punitive damages.

The majority bases it decisions upon the state of mind of the defendant at the time the tortious acts were committed. This is an accepted thesis. They apparently have selected alternate states of mind, proof of which would permit a jury to award punitive damages. According to the majority, punitive damages are awardable "whenever there was evidence of a wrongful act done intentionally, with knowledge that it would cause harm to a particular person or persons" and punitive damages are awardable in this case because there is "substantial evidence from which the jury could have found that during the period involved in this action the defendant had not done everything reasonably possible to eliminate or minimize the damage to adjoining properties by its mill."

I construe the first basis, stripped to its essentials, to state the principle that punitive damages are awardable for all intentional torts. I do not interpret our past decisions to so hold.

We have previously decided that punitive damages could not be awarded in cases in which there was an intentional trespass to land, but the trespasser's motive was deemed not "malicious." *Williams v. Goose Lake Valley Irr. Co.*, 83 Or 302, 309-310, 163 P 81 (1917). In that case the court affirmed the right of a jury to award compensatory damages against an irrigation company which committed wilful trespass by

constructing a ditch across plaintiff's land without any apparent claim of right, but on the ground that it could have condemned the land. However, it reversed the trial court's submitting the issue of punitive damages to the jury, stating: "The testimony in this instance fails to bring the right to exemplary damages within the rule declared in the Kingsley Case." 83 Or at 309-310.

Likewise, in *Huber v. Portland Gas & Coke Co.,* 128 Or 363, 274 P 509 (1929), the complaint alleged that the defendant, without any right, and against the demand of the plaintiff, maintained a gas main across plaintiff's property. The court held that while it alleged a wrongful entry, the complaint would not support a claim for punitive damages.

We have also so held in cases involving intentional harm to persons and chattels.

We decided that the intentional killing of a dog is not sufficient to permit the jury to award punitive damages, although compensatory damages could be recovered. *Green v. Leckington,* 192 Or 601, 236 P2d 335 (1951); *O'Harra v. Pundt,* 210 Or 533, 310 P2d 1110 (1957). In *Lukas v. J. C. Penney Co.,* 233 Or 345, 378 P2d 717 (1963), we held that the jury could find that the defendant had intentionally committed the wrongful act of false imprisonment knowing it would harm plaintiff. We also held, however, that the jury could not assess punitive damages.

The other ground upon which the majority rests its decision that punitive damages are awardable is upon the proposition that defendant has not done everything reasonably possible to prevent or minimize damage to plaintiffs, i.e., on the state-of-mind scale,—negligence.

In certain malpractice cases we have permitted the award of punitive damages although the defendant was at most guilty of a high degree of negligence. However, we have regarded these cases as a separate category. *Rennewanz v. Dean,* 114 Or 259, 229 P 372 (1925); *Holland v. Eugene Hospital,* 127 Or 256, 270 P 784 (1928); *Olson v. McAtee,* 181 Or 503, 182 P2d 979 (1947); cf. *Gill v. Selling,* 125 Or 587, 267 P 812, 58 ALR 1556 (1928).

In what seems to be an ordinary negligence case, *Hamerlynck v. Banfield,* 36 Or 436, 59 P 712 (1900), we permitted the awarding of punitive damages; however, there was no discussion in the opinion of the problem and that case seems clearly erroneous on the issue of punitive damages.

*Reynolds Metals Company v. Lampert,* 316 F2d 272, 324 F2d 465 (9th Cir 1963), relied upon by plaintiffs, does not hold, in my opinion, that punitive damages can be assessed against an industrial concern that a jury finds did not do everything reasonably possible to prevent damage by air pollution. I base this particularly on the evidence in that case that the defendant had conscious knowledge that it could do more to prevent or reduce pollution than it was doing, but it continued to pollute at the same or greater rate because it was cheaper to continue to damage plaintiffs' property and pay compensatory damages than to install available and feasible air pollution equipment. There was no such evidence or inference in the present case. The State Sanitary Authority Director of Air Pollution testified that Georgia-Pacific was proceeding in the only feasible manner,—trial and error—trying, testing, revising, reversing and repeating the sequence.

In my opinion a negligent state of mind should not

be sufficient to enable the jury to award punitive damages. That was the decision in *Berg v. Reaction Motors Div.,* 37 NJ 396, 181 A2d 487, 495-497 (1962). There, the circumstances were similar to what we find existed in the present case. The defendant over a substantial period of time was testing a rocket engine. The noise and vibration from the engine caused widespread damage to the surrounding area. The property owners complained and the defendant took some action to lessen the injuries but continued to test and damages continued. The court affirmed an award of compensatory damages, but vacated the award for punitive damages. The court stated:

> "It may well be that the defendant could have exercised greater care and diligence, perhaps in the selection and arrangement of the testing sites and stands, in the development of the sound suppressor, and in the course of its other activities. But that would merely indicate negligence and would be a far cry from the plaintiffs' charge of deliberate conduct with knowledge of high probability of harm and reckless indifference to consequences. * * *" 181 A2d at 496.

Many times this court has stated: "Punitive damages are not favored in the law." *Becker v. Pearson,* 241 Or 215, 405 P2d 534, 537 (1965). In *Perez v. Central Nat'l Ins. Co.,* 215 Or 107, 110, 332 P2d 1066 (1958), we stated: "The doctrine of punitive damages viewed in the most favorable light is subject to criticism. *Van Lom v. Schneiderman,* supra. It should not be extended past the point to which our precedents commit us."

The purpose of punitive damages is to deter the defendant and others in like circumstances from committing the intentional act which has injured the plaintiffs. *Van Lom v. Schneiderman,* 187 Or 89, 107, 210

P2d 461, 11 ALR2d 1195 (1949). It is not to provide additional compensation to damaged parties. See Clarence Morris, *Punitive Damages in Tort Cases,* 44 Harv L Rev 1173 (1931).

Punitive damages is an oddity in the law of damages. An award of punitive damages is not to compensate for injury, but to penalize, with the object of deterring. To deter by means of punitive damages was an integral part of the ancient English tort law when public purpose and private compensation were intermingled. When a clear division was made between criminal law, with the object of protection to the public at large, and civil tort law, with the object of compensating injured persons, punishment as a deterrent was left to the state acting through the criminal law. Today, the sole remaining vestige in civil law which provides for punishment is the awarding of punitive damages.

We have never sought to deter defendants from future negligent conduct by awarding of punitive damages, with the exceptions stated above. Negligent vehicle drivers are a much more serious menace than negligent papermill operators; however, we have never intimated we would permit a jury to assess punitive damages against a negligent motorist to deter negligent driving. Permitting a jury to award punitive damages to deter a negligent industry is a change in direction in the law of punitive damages.

Turning to the other bases for the majority opinion, I am also of the opinion that granting the jury the power of deterrence to prevent an intentional trespass is not warranted.

The witnesses called by both parties agree that with the present state of knowledge the defendant can-

not prevent its plant from polluting the air in some degree and damaging plaintiffs' property. Therefore, the only way in which an award of punitive damages can deter defendant from intentionally operating its plant knowing it will cause a trespass or continue a nuisance to plaintiffs' damage is if the award is large enough in amount so that the defendant cannot continue profitably to operate its plant. Any lesser award would be only for the private profit of the parties plaintiff and would not accomplish the public purpose.

In my opinion the granting to a jury of the power to award punitive damages is not a suitable vehicle to decide whether or not an industry should continue to operate.

The jury in the award of punitive damages "acts something like a judge in passing sentence on the defendant in a criminal case." *Van Lom v. Schneiderman,* supra (187 Or at 106-107). Whether or not to award punitive damages and the amount of the award are committed completely to the discretion of the jury. *Van Lom v. Schneiderman,* supra (187 Or at 106-111). "And the jury has entire discretion to refrain from giving any punitive damages at all even though all the elements of malicious and damaging misconduct may have been established." *Van Lom v. Schneiderman,* supra (187 Or at 108).

It also seems anomalous to me that we would permit juries to close down industries by punitive damage awards when there may be factors present which would cause an equity court to refuse to close down the same industry when asked to issue an injunction.

In considering whether or not to issue an injunction closing down an industrial operation because its operation causes a trespass or nuisance to adjoining

landowners, the equity court will "balance the equities." 4 Restatement, Torts § 941, states a portion of the rule as follows: "The relative hardship likely to result to the defendant if injunction is granted and to the plaintiff if it is denied, is one of the factors to be considered in determining the appropriateness of an injunction against tort." Approved in *York v. Stallings,* 217 Or 13, 23, 341 P2d 529 (1959).

*York v. Stallings,* supra, is an example of the approach used by an equity court when asked to grant an injunction. There, the defendants, in 1955, built a sawmill and other wood processing facilities. "Plaintiffs complain that from the time it began to operate defendants' sawmill caused great quantities of smoke, sawdust, cinders, ashes and other particulates to be deposited on plaintiffs' premises and that the operation of the conveyor at night caused excessive noise." (217 Or at 16)

The trial judge enjoined the defendants from burning waste except at a place which would prevent sawdust and other particulates from going onto plaintiffs' land and from operating the conveyor at night unless the noise could be effectively eliminated, and awarded damages, presumably compensatory damages.

This court reversed, saying:

"Although we have found that the fallout of sawdust and cinders on plaintiffs' premises and the noise at night entitled plaintiffs to some relief, it does not follow that an injunction should issue as a matter of course. * * *

"Perhaps the cases that best illustrate the dilemma faced by the courts in situations of this kind are *Madison v. Ducktown Sulphur Copper & Iron Co.,* 113 Tenn 331, 83 SW 658; *Georgia v. Tennessee Copper Co.,* 206 US 230, 237 US 474, 240 US

650. The smoke and gases from the copper reducing apparatus clearly constituted a nuisance, yet the courts refused to issue the injunctions that would in effect close down the most important industry in the area. Although the case at bar is not a Ducktown case, it does indicate clearly the desirability of adopting a reasonably flexible rule." 217 Or at 22-23.

The judgment of this court in *York v. Stallings,* supra, in part, was:

"(1) the decree with regard to the abatement of noise caused by the conveyor at night should be modified to enjoin only noise which will unreasonably interfere with plaintiffs' enjoyment of their property;

"* * * * *

"(3) the decree enjoining the defendants from burning waste products in their mill is set aside; and the case is remanded with instructions to take such further testimony as may be offered by either party with regard to (a) any improvements in the burner or its operations since the former trial; (b) whether fallout is still occurring in and about the York home, and if so, the nature and extent thereof; (c) the feasibility of transporting the sawdust to another place for burning or disposal and whether such a program would be so burdensome as to cause a shutdown of the defendants' mill. The court shall then enter such decree as may be consistent with the principles herein announced." 217 Or at 25-26.

We are committed to the doctrine in considering injunctions that an industry will not be closed down if it is merely proven that the operator is knowingly and continuously committing a trespass or nuisance to the damage of the adjoining landowner; the equities must be "balanced." I cannot understand why we should adopt a contrary view by permitting a jury

to award punitive damages in order to accomplish the same end, closing down the operation.

In addition to this seeming contradiction, the judgment in the *York* case illustrates the flexibility possessed by the equity court in dealing with the problem as contrasted with the "meat-axe" approach of punitive damages.

The plaintiffs state in their brief that an injunction probably would not be granted "due to the economic benefit of the plant to the community." I do not know whether or not this is a correct forecast; however, if a court sitting in equity would not shut down the defendant's operation, a jury should not be given the discretion to bring about a contrary result.

PERRY, J., joins in this dissent.

O'CONNELL, J., dissenting.

The only justification for the impostion of punitive damages is to deter wrongful conduct in those circumstances where other legal sanctions are not available to effect deterrence.[1] Our air pollution statutes (ORS 449.760 to 449.990) contain a variety of sanctions sufficient to provide adequate deterrence. We should not, therefore, apply the doctrine of punitive damages to the present case.

PERRY, J., concurs in this opinion.

[1] "* * * Numerous possible theoretical foundations exist for the award of such damages, but by analysis and the process of elimination it has been argued that the only proper basis for exemplary damages is their function as deterrents of wrongful conduct where compensatory damages and criminal sanctions are inadequate to deter such conduct." Hodel, The Doctrine of Exemplary Damages in Oregon, 44 Or L Rev 175 at 240 (1965).