# E. W. SHANNON v. STATE OF OKLAHOMA.

No. A-2114.   Opinion Filed November 28, 1916.

(160 Pac. 1131.)

1.  **EMBEZZLEMENT — Trial—Direction of Verdict—Sufficiency of Evidence.**   When the evidence introduced upon the trial of a person indicted or informed against for crime, fails to disclose the commission of a public offense, the court should advise the jury to return a verdict of not guilty, for the reason that a verdict of guilty would be contrary to both the law and the evidence.

2.  **EMBEZZLEMENT—Elements of Offense—Fraudulent Conversion.** A fraudulent conversion is an essential element of the crime of embezzlement.

*Appeal from the District Court of Grady County*
*Hon. Frank M. Bailey, Judge.*

E. W. Shannon was convicted of embezzlement and appeals. Reversed.

*F. E. Riddle* and *C. F. Dyer,* for plaintiff in error.

*C. J. Davenport,* Asst. Atty. Gen., for defendant in error.

ARMSTRONG, J.   The plaintiff in error, E. W. Shannon, was convicted at the January, 1913, term of the district court of Grady County, on a charge of embezzlement, and his punishment fixed by judgment of the court at imprisonment in the state penitentiary for one year and one day.   From the judgment of conviction in the trial court, the plaintiff in error prosecutes this appeal, and the principal ground upon which he relies for a reversal is that the verdict of the jury is contrary to law and to the evidence.

It appears that a corporation known as the Southwestern Wholesale Grocery Company, was organized at Chickasha, in 1908; that the plaintiff in error invested $5,000.00 in the capital stock; Henry Oberstein $5,000.00; H. B. Spencer $2,000.00; R.

L. Richards $1,000.00; C. M. Hollingsworth $2,000.00 and J. B. Harper $5,000.00. Harper was elected president and had charge of the management of the business. Plaintiff in error, Shannon, was elected secretary and treasurer and was also one of the active officers of the corporation.

At the beginning of business in October, 1908, certain of the officers and directors opened accounts between themselves and the corporation, among them the plaintiff in error. All of the merchandise and money drawn from the corporation by the plaintiff in error was charged to his account at the time the same was drawn. The salaries were credited to the respective accounts of those drawing them from time to time as the same became due.

It appears that the plaintiff in error drew the checks for the payment of all bills and accounts. The account between the corporation and the plaintiff in error was carried from the day the business was opened until it was closed, a period of three or four years. There is no irregularity in the account and no contention, so far as we can discern from the evidence, that any sum of money or any merchandise was ever taken from the corporation by the plaintiff in error, except such items as were charged to his account at the time taken.

When the business was finally dissolved, J. B. Harper was appointed trustee to wind up its affairs. At the time of the appointment of the trustee, the plaintiff in error was indebted to the corporation in a sum amounting to about $1,200.00. Harper, as trustee, took the note of the plaintiff in error in settlement of his account. The trustee was appointed the latter part of 1910 or the first part of 1911. In December, 1911, the trustee, Harper, died, and H. B. Spencer was appointed to succeed him. Spencer and Shannon were unfriendly. It appears that Shannon had participated in a meeting of the Board of Directors that ousted Spencer from the directorate.

During the year 1912, Spencer, Hollingsworth, and Richards, all of whom were original stockholders in the corporation, ap-

peared before the grand jury and sought to have the plaintiff in error indicted, but the grand jury refused to indict him. About the same time, the county attorney of Grady County was consulted by these witnesses with the view of prosecuting the plaintiff in error. The county attorney refused to prosecute the plaintiff in error at the public expense. Later, however, the prosecution was instituted.

A short time prior to the dissolution of the business, the plaintiff in error, who had been connected with the same since it started, was ousted as manager and treasurer, and C. M. Hollingsworth, one of the prosecuting witnesses, was substituted in his stead. The plaintiff in error was continued as bookkeeper.

A review of the record impels one to the conclusion that this prosecution was resorted to solely for the reason that the plaintiff in error failed to pay the $1,200.00 note due the corporation. At all times the books of the corporation showed the status of its affairs. The directors at all times knew, or should have known—it was their duty to know—the existence of its relationship between its customers and itself. The testimony given by the prosecuting witnesses indicates clearly that there was no effort on the part of the plaintiff in error at any time to mislead the Board of Directors or any officer or stockholder as to the facts, and neither of the prosecuting witnesses pointed out a single transaction in his testimony which indicated that plaintiff in error, Shannon, was endeavoring to fraudulently appropriate the assets of the company to his own use and benefit. In fact, there is a total absence of the fraudulent intent required under the law to constitute the crime of embezzlement. The relation was clearly that of debtor and creditor. Extracts from the testimony of the prosecuting witnesses clearly indicate that fact to our minds.

Witness Spencer, among other things, testified as follows:

"Q. What position have you held with the corporation yourself? A. Director. Q. What is your official position at this time? A. I was appointed trustee to wind up the business, after

Mr. Harper's death. Q. What position do you hold at this time? A. Trustee, appointed by the court. Q. What was Mr. Hollingsworth's position with that corporation when he went in? A. We put him in there as manager and to oversee it. Q. Was this defendant employed there at that time? A. Yes, sir, he was. Q. At the time Mr. Hollingsworth went in as manager of the concern, from then on what was this defendant's position there? A. Bookkeeper. Q. At the time Mr. Hollingsworth went in there as manager were you a stockholder and director of that corporation? A. Yes, sir. Q. At that time, I will ask you if this defendant, E. W. Shannon, as secretary and treasurer of that corporation, made a financial statement of that corporation to the Board of Directors? A. He did. Q. In which it showed the liabilities and the assets of the corporation? A. He did. Q. Mr. Spencer, have you any other record that shows a statement about that time to that corporation? A. I have a note in my possession given to J. B. Harper for $1,200.00. I don't know what it was given for. Q. Where did you get that note? A. I found it in the papers I got from Mr. Harper. Q. Have you ever presented that note for payment? A. Yes, sir, I went to Oklahoma City to see Mr. Shannon about it and he said he could not pay anything on it. Q. At that time state whether or not he admitted or denied the execution of that note? A. He did not deny it, he just said he could not pay it. Q. How many times have you seen him on those occassions? A. I went there on but one occassion, may be twice. Q. Have you any other record which shows his standing with that corporation? A. There is a trial balance there he got off. Q. Who made it out? A. Mr. Shannon did, I suppose. He is the only one who had charge of the books. Q. Where did you get it? A. In the papers I got from Mr. Harper after his death. Q. Does that statement show any indebtedness of this defendant, E. W. Shannon, to the Southwestern Wholesale Grocery Company? A. Yes, sir, an indebtedness of $1,200.00. Q. And Mr. Shannon got that up? A. Yes, sir, and there is a line drawn through it and says 'note'. G. And when did you get it? A. After I was appointed trustee. Q. Mr. Spencer, have you any other statement here which shows his standing with that corporation about that time? A. At different times down to that date I have. Q. State to the court and jury whether or not the one you have identified here as being his standing with the corporation was the last statement he ever rendered the corporation. A. Yes, sir. Q. Whose handwriting was that kept in? A. In Mr. Shannon's handwriting. Q. Has that amount of

$1,200.00 as shown by that note and as shown by the books here ever been paid to the company by this defendant? A. No, sir, it has not. Q. It is outstanding? A. Yes, sir. Q. Who composed the board of directors at that time? A. Mr. Shannon, Mr. Ober-stein, Mr. Harper, Mr. Richards, Mr. Smith and myself. Q. What kind of an official position did Mr. Harper have with that corporation? A. President. Q. What were his duties. A. To kinder oversee things and take charge of it? Q. And to run the business? A. Yes, sir, it would have been his duty if he had attended to it. Q. He is dead now? A. Yes, sir. Q. You did not tell him when he was alive that he did not attend to it? A. No, sir, he was a good old man. Q. And this note was given for this account? A. I suppose so. Q. You testified before the Justice of the Peace that it was? A. I suppose so, and Mr. Shannon did not deny it. Q. The record shows it was closed by a note? A. Yes, sir. Q. It is payable one year after date, with interest at eight per cent? A. Yes, sir. Q. Did you go to see Mr. Shannon before this note was due? A. I asked him about it several times before he left town, and I went to Okla-homa City to see him. Q. You did present it to him when it was due? A. Yes, sir, after it was due. Q. And he said he was not able to pay it? A. Yes, sir. Q. When was Mr. Shannon em-ployed down there? A. At the beginning of business in 1908. Q. The books show that he opened up an account there with him-self? A. I don't know. Q. You say you are trustee and have not examined that account? A. I examined the last part of it. Q. You have not looked over the account? A. Yes, sir. Q. When did it begin? A. I can look at the book and see; I have looked at the tail end of the account. Q. Did Mr. Harper owe the company? A. He did, and he paid it. Q. And the board of directors knew that? A. Not until all this came up; we knew it all at the same time. Q. You and the board of directors had considerable trouble at one time? A. A little. Q. Didn't Mr. Shannon and Mr. Harper and Mr. Oberstein put you off the board of directors at one time? A. Yes, sir, and turned and elected me back. Q. Who was at the meeting when they voted you off? A. All of the directors, I think. Q. Who? A. Mr. Shannon, Mr. Oberstein, Mr. Harper, Mr. Smith and Mr. Holl-ingsworth. * * * * * If Mr. Shannon had paid that note you would not have had him arrested, would you? A. So far as I am concerned, I don't suppose I would have had anything to do with it, so far as I am concerned. Q. You would not have tried to have him arrested? A. I would not have sworn out the

complaint against him unless I had to. Q. Isn't it a fact that what actuated you to swear out this complaint was that he did not pay the note? A. If he had paid the note when it was due, I would not have sworn out a warrant for him. Q. The fact that he did not pay it was the matter that actuated you in swearing out the complaint? A. Yes. Q. I will ask you if since this case has been set for trial this term of court, if you have not made efforts to have this mater settled through Ed Johns? A. No, sir, Mr. Johns took that up himself; I told Mr. Johns I thought it could be settled. Q. Didn't you ask him last Saturday? A. I called him up and asked what Mr. Shannon had done. Q. Assuming that Mr. Shannon's account started when this business started, it was a regular and continuous account until the business closed. A. I think so. Q. All the money drawn was charged to his open account, regularly, so far as you know? A. Yes, sir, so far as I know. Q. You don't know of a dollar that he took that he did not charge to his account. A. His books are all I have to go by. Q. The books do not show any? A. No, sir. Q. And he is credited on that account with all the salary due him? A. Yes, sir. Q. And that account run for a period of something like two and one-half or three years? A. Yes, sir, about three years. Q. And at the end of that account he owed the corporation $1,200.00? A. Yes, sir. Q. And it was settled by this note; that is correct, is it? A. I suppose so. Q. And you have not found anything irregular in this account, or any one else, have you? A. No, sir. Q. I will ask you if Hr. Harper, as chief executive officer of the corporation, he had the general management of the corporation? A. Yes, sir. Q. Do you know anything about what authority he gave any of the officers conntcted with the corporation? A. No, sir, I do not."

Witness Hollingsworth, among other things, testified as follows:

"Q. What position did you occupy? A. Stockholder. Q. Any other position? A. Director. Q. When were you elected director? A. At the first meeting after the charter. Q. When was that? A. In August, 1908. Q. How long did you continue to be a stockholder of that corporation? A. As long as it existed. Q. During the life of that corporation, from the time that it was organized up to just before it was dissolved, what connection did the defendant here, E. W. Shannon, have with that corporation? A. Director and secretary and treasurer from the beginning up to January or February, 1911, and after that

time he was just the bookkeeper there. Q. Who was manager from then on? A. I had charge of the business from February the first until the business was closed up. Q. When did you take charge of the corporation? A. February 1st or 2nd,1911. Q. Was there a meeting of the stockholders or directors just prior to that time? A. Yes, sir, directors and stockholders too. Q. State if at this meeting this defendant, E. W. Shannon, rendered a financial statement of the condition of the corporation to that meeting? A. Yes, sir, to the stockholders. Q. Did he render any statement which showed the personal liability of persons to the corporation? A. At that meeting, I think the statement rendered to the stockholders' meeting was the bulk and not an itemized statement of each one's account; but just after that I got a statement from him, he gave me a statement and itemized list of parties who owed the corporation. Q. Do you know where that statement is now? A. No, sir. Q. Have you ever delivered that statement to any one else? A. I delivered the statement to Mr. Westheimer, and we went over it. Q. Did you get it back in your possession? A. Yes, sir, I think I did; I may not have. Q. Do you remember what that statement showed, if it did show the financial condition of Mr. Shannon, with the corporation at this and state what it is? A. Itemized statement of accounts at the close of the business when Mr. Harper was made trustee. Q. Were you at that time connected with that business? A. Yes, sir. Q. As manager? A. Yes, sir. Q. Do you now who prepared that? A. Mr. Shannon prepared this. Q. What was he that time? A. Yes, sir, it showed Mr. Shannon owed something doing at that time?. A. Bookkeeper. O. Examine this page of the record and see if it shows the condition of E. W. Shannon's account relative to the Southwestern Wholesale Grocery Company at the time that statement was made? A. Yes, sir. Q. What does it show it to be? A. $1,200.00.''

Witness Richards, among other things, testified:

"Q. How much stock did Mr. Shannon have? A. $5,000.00, I think. Q. Paid that much in cash? A. I think so. Q. Mr. Shannon lost all his $5,000.00? A. I think so."

The plaintiff in error, among other things, testified: over $1,200.00; funds taken out by Mr. Shannon. Q. Examine

"Q. Was Mr. Spencer put off the Board of Directors? A. Yes, sir, he was put off at the meeting in January and stayed off until sometime in February, when they appointed the new di-

rectors. Q. Under whom did you act? A. I acted as manager under the President; the manager was appointed by the officers of the company. Q. Did you at any meeting of the Board of Directors ever try to conceal anything from anyone relative to your account? A. No, sir. Q Was there ever a dollar not charged up against you on your account? A. Just as they occur each day. Q. Tell the jury if you gave yourself credit there for one cent you were not entitled to? A. No, sir. Q. Did you try to charge up to yourself one cent you did not believe you were entitled to? A. No, sir. Q. Was anything drawn from the company that is not charged on that account? A. No, sir. Q. Tell the jury if Mr. Harper knew the condition of your account during the time the business was running? A. Yes, sir, every month the sale ledger and personal ledger was gone over, taken off and handed to the credit department each month, that was Mr. Oberstein and Mr. Harper, every month. Q. Did that include your account? A. Yes, sir. Q. And they were open to the Board of Directors at all times? A. Yes, sir. , Q. This is your signature, to State's Exhibit '3'? A. Yes, sir, I signed that note. Q. At whose request did you give that note? A. At the request of Mr. Harper. Q. Did Mr. Spencer come to Oklahoma City to see you about that note? A.Yes, sir. Q. Could you have paid him at that time? A. No, sir. Q. What did you tell him? A. I told him I was not in a position to pay it. Q. What became of your $5,000.00 and the $500.00 dividend you put into the business? (Objected to and sustained.) Q. Did you, in drawing your salary, draw it at the end of the month? A. Just as I needed it. Q. Just as it is charged on your account? A. Yes, sir. Q. You say there was a credit of $500.00 on your account at the beginning? A. No. sir, that is an error; it was a charge against my account, but that was later paid and on the 30th' of October, 1908, my account was balanced. Q. The account discloses every dollar that you ever drew from the company? A. Yes, sir."

The foregoing is a substantial statement of the evidence and it appears therefrom that there is no material dispute as to the main facts.

The conclusion which we have reached, that the relation between the Southwestern Wholesale Grocery Company and the plaintiff in error was that of debtor and creditor, is not based upon the fact that the plaintiff in error failed to deny the debt or that he admitted owing it and executed the note in payment of

same. This conclusion is based upon the facts and circumstances surrounding the entire transaction from the organization of the corporation until it was closed. The fact that all the transactions were within the knowledge of the officers and directors of the corporation and that the account was run and kept in the regular course of business just as any other account, without any fact or circumstance from which the least inference of criminal intent could be deducted indicates clearly that no criminal conversion occurred.

A fraudulent conversion is an essential element of the crime of embezzlement. See *Blake v. State,* 12 Okla. Crim.____, 160 Pac. 30, and authorities therein cited and quoted.

The proof having failed to disclose the commission of a public offense, from any reasonable view thereof, it follows that the court should have sustained the motion on the part of the plaintiff in error to advise the jury to return a verdict of not guilty. In our opinion the verdict is both contrary to the law and the evidence.

The judgment is therefore reversed and the cause remanded with directions to dismiss.

Mandate ordered forthwith.

DOYLE, P. J. and BRETT, J., concur.