## McALLISTER v. STATE.

No. A-11722. Aug. 5, 1953.

(260 P. 2d 454.)

John L. Ward, Jr., O. C. Lassiter, Tulsa, and Coffey & Coffey, Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and James P. Garrett, Asst. Atty. Gen., for defendant in error.

POWELL, P. J. Involved is an appeal by C. B. McAllister, who will hereinafter be referred to as defendant, from a conviction in the district court of Tulsa county where a jury found him guilty of a charge by information of the crime of embezzlement and set the punishment at two years in the State Penitentiary.

For reversal some eighteen errors are set out in the petition in error, and the printed briefs of defendant total 153 pages, and the brief of the Attorney General is also extensive, as is the case-made. We have spent much time studying the record and briefs and do not find it necessary to treat all the matters urged, as they are not necessary for a solution of this case, as will later appear. The facts developed at the preliminaries will only be recited where proper for consideration at the actual trial. Tit. 20 O.S.A. § 47.

Defendant first sought to quash the information, contending that his rights were prejudiced by reason that he was not bound over on the charge filed until after a hearing before a second magistrate, where another judge sat in an advisory capacity and orally expressed the thought that probable cause had not been shown. It is also contended that the evidence produced by the state at the second preliminary hearing was insufficient to show that an offense had been committed or that there was probable cause to believe that the defendant committed it. As to the plural preliminary hearings, this court has passed on that contrary to the contentions of the defendant in a number of cases where the principle involved has been discussed in some detail and which cases may be referred to for fuller treatment. Pierro v. Turner, 95 Okla. Cr. 425, 247 P. 2d 291; Ridenour v. State, 94 Okla. Cr. 921, 231 P. 2d 395; United States ex rel. Rutz v. Levy, U. S. Marshal, 268 U.S. 390, 45 S.Ct. 516, 69 L. Ed. 1010. The principle is also involved in Ex parte Johnson, 1 Okla. Cr. 414, 98 P. 461, approving plural applications for writs of habeas corpus.

The main evidence that the state relied on for the conviction of the defendant was that of the complaining witness, A. D. Kneale, who was the main witness

in the second preliminary hearing, but who did not testify at the trial (although present in Tulsa and duly subpoenaed by the defendant), because his physician testified and the court concluded that to do so might prove fatal or at all events would be detrimental to the health of the witness, by reason of the fact that he had undergone a heart attack some time previously. More will be said about the testimony of this witness in further issues to be treated. Other witnesses testified for the state on preliminary hearing: Judge William N. Randolph, L. D. Pilkington, public accountant, and C. L. Thompson, assistant clerk of the municipal court of Tulsa. All these witnesses, with the exception of Kneale, testified at the trial. Counsel's contention that the hearing was a mockery and therefore distinguishable from the authorities heretofore cited, implies bad faith on the part of the magistrate, Judge Edmister, when there is nothing in the record to support such assertion, and such manner of treating the proposition urged is ill-advised, is not helpful and contrary to the spirit of the rules of this court. Rule 10.

While counsel seems to recognize the rule announced in Taylor v. State, 79 Okla. Cr. 115, 152 P. 2d 123, and other such cases, to the effect that on preliminary the task of the prosecution is only to show that a public offense has been committed, and that there is reasonable grounds to believe that the defendant committed the offense, it is argued that the state failed to meet such burden at such preliminary hearing.

From a study of the transcript of the evidence we have concluded that although the question is unusually close, that probable cause was shown; and that the extra judge was merely acting in an advisory capacity and his opinion was simply and only for the benefit of the examining magistrate who could accept or reject it as his own intellect and conscience might dictate. We find no provision in the statutes, Tit. 22 O.S. 1951, for a sharing by a magistrate of his responsibilities with a second magistrate. Ex parte McAllister, 94 Okla. Cr. 196, 232 P. 2d 649, may be referred to for a detailed statement concerning the two preliminary hearings. The trial court, therefore, did not err in overruling the motion to quash the information by reason of the insufficiency of the evidence at the second preliminary hearing.

It is urged that Judge Elmer Adams' "refusal to transfer the case to another division of the district court for trial, on motion by McAllister, amounted to an abuse of discretion and denied McAllister the fair and impartial trial guaranteed him by the Constitution."

In the beginning, defendant recognizes the statutory provision, Tit. 22 O.S. 1951 § 575, which provides that a defendant, where a judge fails upon application of a defendant to disqualify and does not do so within three days before said cause is set for trial, may make application to this court for mandamus requiring him so to do. Recognized also is the rule and holding of this court in such cases as Young v. State, 74 Okla. Cr. 64, 123 P. 2d 294, 295, where we have said:

"Where one had knowledge of the grounds of disqualification for more than three days prior to the day set for trial, and did not avail himself of the procedure prescribed by the above statute, he cannot urge the disqualification on appeal."

But defendant seeks to avoid the statutory provision by the words of counsel in brief as applied to the particular facts: "We say the constitutional and not the statutory provision is what forbids a prejudiced judge from acting officially." So we decide in view of one of the most complicated and piecemeal records that it has been our duty to study in some time, to consider the basis for

disqualification, although there was actually (though barely) time and no application was made to this court to require the trial judge to disqualify.

The defendant was arraigned in the trial court on the 6th day of June, 1951, and then began a series of events worthy of notice. The defendant was arraigned before Judge Horace Ballaine, but did not enter a plea. He filed a motion to quash the information, as heretofore mentioned, and the case went over until June 7, 1951, when Judge Ballaine overruled such motion.

The case thereafter came on for trial on the 10th day of October, 1951, before Judge Elmer Adams, who permitted the defendant to withdraw his plea of not guilty and renew his motion to quash. In addition to this motion, counsel for defendant also filed a demurrer to the information, and also a motion to transfer the case to another division of the court. Judge Adams overruled the two motions and the demurrer. Defendant re-entered his plea of not guilty. And here continued the series of events prolonging the hearing, after one adjournment, until and through the 19th day of October, 1951, when the trial was completed.

The basis for the claim of disqualification of Judge Adams as set out in affidavit attached to the motion was that the prosecuting attorney at trial had been Judge Adams' assistant at the time when he was county attorney of Tulsa county prior to his election as district judge. It was further alleged that the defendant was a "professional bondsman" and that Judge Adams when he was county attorney had questioned the sufficiency of the value of property scheduled on bonds executed by him, and therefore had questioned McAllister's honesty and integrity. In support of this was attached a copy of a motion to require additional security that had been filed by Margaret Lamm (an assistant county attorney of the time) in State v. Britt, pending at such date in the district court of Tulsa county. The affidavit set out that C. B. McAllister had scheduled a certain lot assessed at $2,000 on other bonds amounting to $3,500 in the district court, and $4,000 in the court of common pleas, and $1,000 in the municipal court of Tulsa. There was no allegation as to the reasonable market value of the property so scheduled. No oral or other evidence was offered to show the disqualification of the judge. Judge Adams dictated a detailed statement pointing out in effect that the case fell to him to try in the orderly process of the division of cases between the judges of the district court of Tulsa county. He denied being hostile to or prejudiced or biased against the defendant, and overruled the motion to disqualify.

The fact that some assistant of Judge Adams' when he was county attorney had questioned the sufficiency of security scheduled by the defendant who had executed a bond, would certainly not disqualify such county attorney when he was later elected a judge, to sit in a case where such bondsman was the defendant. The program of checking the security scheduled on bonds of various bondsmen, which apparently had been delegated to one of the assistants in the office, merely indicates that the county attorney was on the job and alert and endeavoring to carry out the duties of his office. The affidavit was insufficient to form the basis for disqualification of Judge Adams.

We would observe at this point, however, that on motion in arrest of judgment, that defendant did introduce into evidence quite a number of clippings from the local newspapers carrying stories of the campaign of Judge Adams, when he was county attorney, to require collectible bonds, and of his efforts to see that only bonds were approved by the various clerks of court where sufficient real property was actually scheduled so as to make the bond in fact collectible in case of the necessity of suit. Some of the articles purported to quote Judge Adams, and to show that the particularly mentioned McAllister as

filing bonds that did not in fact schedule proper security, etc. The tone of the newspaper articles did have a tendency to seriously question the activities of McAllister and other "professional bondsmen" and brand them as not the most desirable and worthy members of society. And though such sentiment possibly derived from the newspaper articles could not perhaps be charged to Judge Adams as to the defendant, or prevent the judge from sitting as an impartial judge, if this case was being reversed for a new trial it would be our suggestion that Judge Adams should not sit as the judge, but that some judge should be assigned not having heretofore acted in the matter in any way. We say this without going into the many cases that have been cited pro and con by the parties. It is a safe rule to follow when there is some basis in the circumstances and will certainly remove at once any chance of a charge that the rights of the litigant were not scrupulously guarded by an impartial judge in the process of a determination of his guilt or innocence of the charge for which he would be tried.[1]

If a new trial were indicated, it is our thought that the information would have to be amended by striking the word "servant" from the charging part wherever it appears. Otherwise, it is sufficient. We think that in context it did not mislead the accused.

The pertinent portions of the information and the statute under which it was filed, Tit. 21 O.S. 1951 § 1454, will be mentioned hereinafter.

This brings us to a consideration of the motion of the defendant for a continuance, which was not filed until the 16th day of October, 1951. The case had been adjourned on October 10, 1951, because defense counsel who had subpoenaed the complaining witness, A. D. Kneale, wanted to cross-examine his physician, Dr. Paul T. Strong, whom the county attorney contended had told him, as well as defense counsel, by 'phone, that it was the physician's opinion that witness Kneale could not safely testify at the trial due to a heart condition that could easily be aggravated and prove fatal from the ordeal. Dr. Strong was then absent from the city so that the case was continued until October 16, when Dr. Strong did testify and verified the contentions of the county attorney, so that the court refused to cause the witness to be brought in for the purpose of testifying and overruled the objection and held that the evidence of A. D. Kneale taken at the second preliminary hearing when defendant was bound over to answer the charge of embezzlement might be received in evidence and read to the jury, in view of the fact that the defense had opportunity to cross-examine at the preliminary. This undoubtedly is ordinarily the rule, Warren v. State, 6 Okla. Cr. 1, 115 P. 812, 34 L.R.A., N.S., 1121; Holt v. State, 84 Okla. Cr. 283, 181 P. 2d 573; Rich v. State, 51 Okla. Cr. 418, 1 P. 2d 805; Lyons v. State, 76 Okla. Cr. 41, 133 P. 2d 898, and so admitted by the defense. However, by the same token that does not require the state to "go all out" at the preliminary, the defense claims the right in effect to become acquainted with the nature of the state's proof, and though it only had to be sufficient to show probable cause, nevertheless, it would afford defendant an opportunity at a future trial, if any, to so organize to meet the issue. It was insisted that the complaining witness, being vital to the solution of the case, should testify at the trial. But the physician's testimony was that such could not be recommended from a medical standpoint, as already indicated, due to the excitement that the judge, jury and spectators might engender in the witness, but (and here is the peculiar circumstance said to distinguish this case from those cited) *at the same time saying that he did not think it would be detrimental to the defendant for his deposition to be taken at his*

---

[1] In connection with this thought, we believe a reading of the chapter "The Challenge of the Press", having to do with trial by newspapers, found in a new book: "Conduct of Judges and Lawyers" prepared by Judge Orrie L. Phillips and Philbrook McCoy under the auspices of the American Bar Association, and published by Parker & Co., Los Angeles, would be of interest, and the book as a whole is challenging and merits serious study by every member of the Bar.

*home by the state or the defense.* He further expressed the idea, from his own acquaintance with witness, that Mr. Kneale would be glad to have his deposition taken. In view of such a situation the defense then urged a continuance for the purpose of taking Mr. Kneale's deposition but the case had already been woefully dragging, so this was denied.

The gist of the defendant's affidavit was to the effect that witness Kneale in addition to the testimony given at the preliminary hearing would swear that he had known one Fred Hefner, who was casually mentioned by him at the preliminary, for many years as a fellow employee of the Mid-Continent Petroleum Corp., witness being an officer, but Hefner being a special peace officer employed by the company; that Hefner was particularly well acquainted in Tulsa police circles; that Kneale left to Hefner and his attorney, whom he had not seen, but only talked to by 'phone on recommendation (and apparently by direction) of McAllister; that Hefner and the attorney succeeded in getting the case postponed for about seven months and then the charge of driving a motor vehicle while under the influence of intoxicating liquor was reduced to the lesser charge of reckless driving with simply a fine and costs of $100 and ninety days suspension of his license to drive; that Kneale did not even have to appear in court at the different hearings and settings; that said Hefner advised Kneale by telephone of the working out "of the deal" for the lesser charge, which required immediate payment of the fine and relinquishment to the clerk of the court of the driver's license; and that Hefner advised Kneale that he had obtained $100 from McAllister with which to pay the fine and costs, and would be out to pick up the license right away; that Hefner did pick up the license and did deliver it to the police court clerk, from whom Kneale subsequently retrieved the license on expiration of the ninety days, and that McAllister did advance $100 to Hefner to close the matter, and that when Kneale picked up his license, that Don Kile, the police court clerk, told him that the case was then at an end and everything was taken care of, and that Kneale then being convinced that the matter was actually completed and that he owed defendant $100, made out a check, not in favor of the court clerk whom he could have there paid without further ado if it was not paid, but in favor of McAllister, which then of course required him to go to the additional trouble of hunting McAllister's office, where he left the check with a girl clerk with the statement that he owed that to McAllister for payment of his fine, and to deliver the check to him.

It was further set out that in the interval Fred Hefner had died and that it required the testimony of Kneale to prove some of the matters set out and give necessary corroborative evidence as to a portion that defendant could testify to. It was also alleged that Kneale had never claimed to defendant that the $100 paid to him was for anything other than reimbursement of the money defendant paid Hefner for the purpose of paying Kneale's fine, but that prior to the information being filed defendant had given Kneale a check for $100 and he was authorized to use it in case the city of Tulsa should actually seek to incarcerate him for nonpayment of the fine in question; that the city never at any time sought to incarcerate Kneale or make any claim for further payment of the fine, but chose to summarily charge defendant with embezzlement in absence of notice or demand. No issue was made by the State that Kneale would not give the additional testimony along the line alleged or that such evidence was not material to the defense.

The court overruled defendant's "objection to introduction of transcript of complaining witness' testimony taken at preliminary and defendant's motion for continuance", and the trial proceeded.

Prior to ruling the court took time out to read the transcript of the evidence taken at the second preliminary hearing. It was necessary to read the entire

transcript as the defense had also raised the question that we have just passed on, as to the sufficiency of the evidence to show probable cause. So that it was necessary for the second time to consider the evidence of Kneale so given on preliminary. It is apparent from the transcript that his evidence must be and is the key to. the whole case.

In Simmons v. State, 68 Okla. Cr. 337, 98 P. 2d 623, this court held:

"4. The granting or refusing of an application for continuance on account of the absence of a witness is a matter within the judicial discretion of the trial court.

"5. In reviewing the refusal of an application for continuance on account of absence of a witness, the testimony taken at the trial is considered by this court for the purpose of determining whether the absent testimony was probably true, as well as whether it was material, if true."

In the Simmons case under the particular facts, the denial of the requested continuance was upheld. In the following cases, though the facts were far different from the within case, the denial was held error: Compton v. State, 48 Okla. Cr. 120, 289 P. 794; Riley v. State, 40 Okla. Cr. 369, 269 P. 377; Merrit v. State, 20 Okla. Cr. 120, 201 P. 529; Morse v. State, 63 Okla. Cr. 445, 77 P. 2d 757. We conclude that each case must stand or fall based upon a consideration of the particular facts.

Here, at this point, then, the problem is to determine whether or not there is a basis in the evidence of the witness Kneale at the second preliminary hearing, or of any of the other witnesses so testifying there, which would make reasonable the allegations of McAllister contained in his affidavit (the gist of which we have recited), which would support the theory that the trial court abused its discretion in failure to grant defendant a continuance either for the purpose of having Kneale testify in person or for the purpose of taking his deposition.

The principle that we are interested in is treated in Wigmore on Evidence (3d Ed.) 1402, where the author states:

"The general principle upon which depositions and former testimony should be resorted to is the simple principle of *necessity*,—i. e., the absence of any other means of utilizing the witness' knowledge. If his testimony given anew in court cannot be had, it will be lost entirely for the purposes of doing justice if it is not received in the form in which it survives and can be had. The only inquiry, then, need be: Is his testimony in court unavailable?"

A. D. Kneale testified that he had been an employee of the Mid-Continent Petroleum Corporation for 35 years and had been assistant treasurer for 20 years; that on the 21st day of May, 1948, he was arrested and charged in the municipal criminal court of Tulsa with driving a motor vehicle while intoxicated. His car was wrecked. He was placed in the city jail and some one whom he did not know advised him that he might get out by having a Mr. McAllister post bond for him; that McAllister appeared and got witness out of jail and drove him home, and told witness to demand a jury trial, and to contact a named attorney, which he did by telephone. He paid McAllister $50 for this service, and stated that he never had any further conversation with him or ever saw him again until the first preliminary hearing of the charge filed against McAllister.

Witness testified that he never appeared in court at any time, was not required to. He further stated that his fellow employee, Fred Hefner and his attorney handled his case; that Hefner advised him in December, 1948, about the reduction in the charge and that he was to pay a fine of $100 and give up his driver's license for ninety days; and that Hefner came and got the license and took it to the municipal court clerk for him; that later, the time having

elapsed, Hefner said: "Let's go down and get it", and that witness called at the office of the municipal court, and Don Kile, clerk, returned the license to him and witness asked him if that settled him up, and was advised by Kile that it did. He stated that thereafter, believing that C. B. McAllister had paid the fine for him, he went by McAllister's office and left with his girl a check made payable to McAllister and in the amount of $100. Witness further stated that some months later he read in the papers that they were having some trouble in the clerk's office and that he decided to and did 'phone the public prosecutor to get him to check the record as to his case. He was advised that the record showed that his fine had not been paid, but he admitted that he never did contact McAllister concerning the matter. Witness stated in effect that McAllister had never told him that he owed him anything or had represented to him that he had paid the fine or would pay it; that when witness delivered the McAllister check to the girl his only comment or instructions to her was that witness owed Mr. McAllister for a fine he had paid for witness.

The prosecution on direct examination had asked: "Q. And at the time you gave the clerk this check, did you leave any instructions? A. I said, 'That is the $100 that Mr. McAllister used to pay the fine. *I owe him $100 to pay my fine at the municipal court.*" (Emphasis supplied.) Of course "to pay" would indicate a future act to be done.

While this testimony, in connection with the other testimony at the preliminary, has been by us held sufficient for the purpose of binding the accused over to answer the charge, there is too much basis in such testimony of the pivotal activities of the private police officer, Fred Hefner, who appears to have been an expert-behind-the-scenes man, with the aid of the attorney, in getting the case continued from May to December, during which there were several settings of the docket, and then in getting the charge reduced from one that carried a penalty of up to one year in the county jail and up to a fine of $500 or both such fine and imprisonment, to simply a total fine and costs of $100. That service alone to a man in Kneale's position would have a considerable value. Apparently all he ever was out was $50, and the $100 left at McAllister's office. Nothing was mentioned about a separate attorney's fee. Ordinarily, Kneale would have paid the fine directly to the court clerk or if a third person was to take care of the matter, it would have been his attorney. He did not have to be bothered with the case. But someone was certainly busy! He testified that Hefner was the man that delivered his license to the court clerk. The fine, according to the later testimony of Judge Randolph on trial, was supposed to have been paid forthwith at the time of the reduction of the charge, the entry of the plea of "guilty" and assessment of the fine, and that his driver's license was also supposed to have been delivered forthwith; that he did not grant a stay; that if he had, a record would have been made on the books, and none appeared. The judge testified to having known Hefner all of Hefner's life and to having seen him outside his chambers with Kneale's attorney the day the case was being disposed of, and that being December 9, 1948.

According to Judge Randolph, he was prevailed upon to reduce the charge at the insistence of the municipal attorney, and on evidence of the heart condition of Kneale. Further, the evidence at the trial, while conflicting, did show that there was $30,000 in the municipal clerk's account that could not be accounted for due to loose bookkeeping. And while State's witness Pilkington, certified public accountant, testified that he did not find a record of the payment of Kneale's fine, he was asked on cross-examination: "Q. You also found from your examination of records in that office that there were instances where receipts for fines paid had been credited to cases in error, did you not?" The answer was: "Yes, sir."

The assistant court clerk, Thompson, testified on cross-examination concerning a notation in the journal reflecting the proceedings in the case against Kneale, where there was found a notation "12-8-48", "B-100-C". Witness testified that this ordinarily would be interpreted: "Bond $100 cash", but he could not tell from the record whether $100 cash was deposited that day or not. He could not so find. He had no personal knowledge.

On trial the defense attempted to introduce in evidence statements made by Kneale at the first preliminary hearing that they considered more favorable to their theory of the case and as clarifying his testimony, but such evidence was not admitted, though under the peculiar circumstances it did become admissible, as will later more fully appear.

The record lends substance to the allegations contained in the affidavit filed by McAllister requesting a continuance. It is our thought that the court abused its discretion in not continuing the case for at least one or two days for the specific purpose of permitting the taking of Kneale's deposition. While the circumstances before the court were sufficiently indicative of the reasonableness of the request prior to the swearing of the jury, the subsequent record made and now reviewed by this court dispels all doubt and compels such conclusion. The matters set out in McAllister's affidavit were vital for a just determination of the case and opportunity should have been afforded for the allegations being inquired into. If admissible evidence could be produced showing that McAllister, in order to get the case disposed of there on December 9, 1948, actually did advance to Fred Hefner, Kneale's man Friday, $100 for payment of the fine, then the state would have no case. Without doubt, Hefner brought in the license. Someone besides Kneale had to, because the matter was permitted to be handled without the presence of Kneale at any time. Reasonably, Hefner might be permitted time to go to his colleague for the license, but it is not only tenable, it is even probable that the great victory he and the attorney had been able to achieve with the then municipal attorney in the reduction of the charge, required the money payment instanter. It would seem that a former municipal attorney as well as the court clerk, Kile, were material witnesses. By reason of the income tax requirements it is necessary for all citizens handling funds to keep records. That applies to McAllister as well as the municipal clerk. There must have been some receipts or cancelled checks that would have shed light on the vital questions raised by the McAllister affidavit. Surely one of McAllister's attorneys, who was Kneale's attorney in the municipal court, knew all about who paid the fine and when, and he could not unless there was basis, have permitted McAllister to have made the affidavit that he did, because of the possibility of serious repercussions.

The testimony of Fred Hefner would have either convinced the prosecution in the beginning that it had no case or have enabled the state without doubt to have produced overwhelming evidence, but Hefner was dead. The testimony of Kneale was vital both alike to the state and to the defendant. The testimony of the witness on preliminary not being comprehensive in ratio to his apparent knowledge, it was error to have refused a short continuance for the specific purpose of taking the deposition of such available though absent witness, who apparently was willing to answer further questions.

The most serious issue in this case involves the overruling of defendant's demurrer to the evidence.

The evidence that we have summarized constituted the vital testimony. There was much other evidence, but not helpful in solving the real issue. The problem now is, Did the state make out a case of embezzlement against the defendant?

As stated in 18 Am. Jr. p. 571, § 2:

"Embezzlement is a purely statutory offense; it is not a common law crime. The object of statutes creating the offense is to meet and obviate certain defects in the law of larceny through which many persons who misappropriated another's property escaped criminal prosecution although the moral turpitude of their offense was as great as in the case of larceny proper."

See Tit. 21 O.S. 1951 §§ 1451 to 1463. There are also other provisions: Tit. 46 O.S.A. § 72; Tit. 19 O.S.A. § 641; and Tit. 21 O.S.A. §§ 341 and 531.

The statutory definition of embezzlement in this jurisdiction is set out in Tit. 21 O.S. 1951 § 1451, reading:

"Embezzlement is the fraudulent appropriation of property by a person to whom it has been entrusted."

And this court has said that:

"The crime of embezzlement, as generally defined by the statutes, consists essentially of the fraudulent conversion or misappropriation of property received in a fiduciary capacity." Christner v. State, 37 Okla. Cr. 95, 257 P. 330, 332; Shannon v. State, 12 Okla. Cr. 584, 160 P. 1131; Blake v. State, 12 Okla. Cr. 549, 160 P. 30, L.R.A. 1917B, 1261; Rogers v. State, 14 Okla. Cr. 235, 170 P. 269, 270, L.R.A. 1918E, 742.

The information specifies the relationship between Kneale and McAllister, this is that McAllister was "then and there the agent, servant and employee of A. D. Kneale and that as such agent, servant and employee was entrusted with and had in his possession and under his control, by virtue of his said trust as such agent, etc., of A. D. Kneale, the sum of $100.00," etc. "* * * Did unlawfully, wilfully, wrongfully, fraudulently and feloniously, embezzle, convert and appropriate the said property aforesaid to his own use and to a purpose not in due and lawful execution of his said trust. * * *" * * *"

The burden, of course, was on the state to prove the charges made. That is elementary. It is at once apparent from a consideration of the testimony that there is absolutely no evidence to support a conviction unless it was by virtue of McAllister being the agent of Kneale for the purpose of paying his fine, or "being otherwise entrusted with or having in his control property for the use of * * * [Kneale], fraudulently appropriates it to any use or purpose not in the due and lawful execution of his trust * * *." Tit. 21 O.S. 1951 § 1454.

The only evidence offered by the state to show that McAllister was the agent of Kneale was the testimony of Kneale given at preliminary hearing and heretofore summarized. It fails to show any relationship between the parties other than as that of a person charged with an offense [Kneale] and his bondsman [McAllister]. According to Kneale he never had any further conversation with McAllister after he got him out of jail and took him home. He paid him for such services. Their relationship ended, unless something thereafter transpired that could have changed the situation. McAllister's duties from there on were to the state to see that Kneale appeared for any hearing before the court or trial, and if Kneale failed to appear and the bond was forfeited McAllister would then have had to produce the accused and have gotten the forfeiture set aside, or he would have been liable for payment of the amount of the bond. Tit. 22 O.S. 1951 §§ 1108, 1107.

But the Attorney General has insisted that McAllister was a person "being otherwise entrusted" with the $100 in question and "for use of Kneale" and that he fraudulently converted such money, etc. It is claimed by the state in the face of the uncontradicted evidence of Kneale that he never talked to McAllister or had any dealings with him after he got him out of jail, that "the character of the

relationship between Kneale and McAllister is shown by the testimony of Kneale with reference to the instruction given the clerk in defendant's office:

"A. I said, 'This is the $100.00 that Mr. McAllister used to pay my fine, I owe him $100.00 to pay my fine at the municipal court.' Q. And this was for the cancellation of the obligation, as you understood it, by reason of the $100.00 fine in municipal criminal court in your case? * * * A. That is correct."

Of course, the above testimony was the only evidence that we could find to justify us in sustaining the action of the trial court in overruling the defendant's motion to quash the information, where it was claimed that the evidence at preliminary was insufficient to justify the order of the examining magistrate holding defendant for trial. It is elementary that a person may be bound over on preliminary hearing to answer the charge in the district court on evidence that would not be sufficient to support a conviction. Tit. 22 O.S. 1951 § 171; Lyon v. State, 55 Okla. Cr. 226, 28 P. 2d 598; 14 Am. Jur. (Cr. Law) § 214.

The presumption is that the state would strengthen its evidence at trial by the production of everything favorable to support the charge.

But here the state apparently did not take seriously the affidavit for a continuance for the purpose of taking the deposition and propounding vital questions to the absent but available and willing witness, who had been duly subpoenaed.

It was apparently satisfied with the testimony of Kneale, given at the second preliminary. We have heretofore recited evidence by Kneale to the effect that he left the $100 at the office of McAllister because he thought McAllister had paid his fine and that he owed him.

The defendant at trial further sought to have considered certain statements given by Kneale at the first preliminary hearing for the purpose of clarifying his later testimony and confirming his positive statement at the second preliminary hearing, all of which it was urged would nullify the above-quoted answer of witness elicited by the leading question of the municipal attorney. This leading question was improper on direct examination, and of course the objection to it should have been sustained.

Among the excerpts from Kneale's testimony at the first preliminary that defendant offered in evidence were the following:

"Q. Did you make any payments or arrangements for the payment of any sum or sums of money, either by check or by cash, or otherwise, for the purpose of paying the fine and costs in that case? A. I don't believe we discussed that matter at all. Mr. McAllister was on my bond and that ended it at that present time. I did not attempt to meet with them at that time and did not discuss the matter with them at that time.

"The Court: What are you doing? Are you just reading excerpts from his testimony on this first preliminary hearing, Mr. Coffey?

"Mr. Coffey: That's right, that which we say is in contradiction to and impeachatory of the testimony in this particular proceeding here.

"The Court: All right, go ahead and pick out the excerpts which you think impeach the witness Kneale or might impeach the witness Kneale.

"Mr. Coffey (reading): Q. Did you talk to Mr. McAllister about the payment of this $100.00? A. Not directly, I did not, no sir.

"Q. You did not, well what was the purpose of this one hundred dollar payment to Mr. McAllister? I will ask you why you made that payment to Mr. McAllister? A. A man by the name of Fred Hefner told me— * * *.

"Q. Subsequent to the time, Mr. Kneale, that you gave this check for $100.00 to the payee, Mr. C. B. McAllister, did you have occasion to check the case, your case down there at the Municipal Criminal Court? A. I took my driver's license, sent it down there. I forgot when the date was, but I went down there to get my driver's license, the ninety days was up, I believe, that was the time I was supposed to have surrendered it and that was up and I went down there to get the driver's license from the clerk of the court, and I said to him, 'Well, I guess this settled the matter so far as I am concerned', and he said, 'Yes it does, Mr. Kneale' and I took my driver's license and left. * * *

"Q. As a matter of fact, you had delivered the check to Mr. McAllister's office to reimburse him for the amount he had paid in payment on your fine? A. That's correct.

"Q. Mr. McAllister at no time reported that he had paid the fine for you? A. I had not seen Mr. McAllister personally.

"Q. Have you at any time made demand for the return of the hundred dollars you paid him, from Mr. McAllister? A. No, sir. * * *

"Q. Mr. Kneale as I understood your testimony, but I want to be clear on it, you testified did you not that some one called you and told you that your fine on this charge in the Municipal Criminal Court was $100.00? A. Oh that I had to pay $100.00. I don't know how you say fine is so much and costs is so much, but I had to pay the sum of $100.00.

"Q. You do not know—who was that? A. I am not sure, but I thought that it was Fred Hefner.

"Q. Fred Hefner, who is Fred Hefner? A. He was a man, I don't know what you call him, he was kind of a private eye, a detective for the Mid-Continent, kind of an investgiator.

"Q. I believe you also testified that he had been helping you in this matter? A. He had, yes.

"Q. So you then got the information that you had been fined $100.00 in the court down there? A. Yes.

"Q. How do you know how long it was after you got that information before you went to Mr. McAllister's office? A. Well thereafter in a few days, I do not know just when, the record will show. I went down there, I do not know when it was and do not know how to tell it, but I went to his office and took that check.

"Q. Were you represented in that case by an attorney? A. Mr. Ward.

"Q. Do you know whether or not it was Mr. Ward who told you that? A. I don't know, it might have been Mr. Ward, I could not say definitely."

Kneale's evidence, considered as a whole, not only fails to show that McAllister was his agent, but the result of Kneale's statements is indicative that his own agent, Hefner, told him that he owed McAllister the $100 and he personally called on the municipal court clerk who advised him that his fine was paid, and he reached his own conclusion that he owed McAllister $100 and he sought to and did pay it. His testimony as a whole refutes any statement of contrary implications. If it shows anything, it tends to show that the money was paid by mistake. The presumption is that the court, the municipal attorney and the officers performed their duties and that when the court permitted Kneale's attorney to enter a plea of guilty in the absence of the accused, that the fine would be collected right then or the accused would have to be produced and placed in jail. If Kneale had been present and the fine had not been collected, McAllister being on only an appearance bond, he would not therefore have been liable if the fine was not collected or Kneale not imprisoned. It is not likely that the officers in view of Kneale not being present would have

risked being charged with the assumption of responsibility for the collection of the fine or the incarceration. We cannot assume that the notation "12-8-48", "B-100-C", which was the date the case was set for trial, and meant "Bond $100 cash" was idle doodling on the part of the clerk who just a few days later told Kneale that his fine was paid.

The evidence is conclusive that McAllister did not hold himself out to Kneale as a person who paid his fine. Kneale came to that conclusion by the representations of others. There was and is the possibility that such representations were correct, so that in view of the fact that all contact, if any, with McAllister after the execution of the appearance bond had to be through Kneale's attorney, or his detective, Mr. Hefner, before McAllister under any tenable theory could be charged with embezzlement of the $100 there would have had to be a conversion; all the matters would have had to have been called to the attention of McAllister and a demand made that the $100 be returned or paid over to the court clerk.

Could it be contended under the facts developed that at the time of the filing of the information that Kneale could have filed a civil suit against McAllister for the return of the $100 without having made a demand upon him to do so? If not, can it not with greater reason be said that such facts, absent demand, are not sufficient to show a fraudulent conversion or embezzlement of such money by the defendant? We so conclude. Blake v. State, supra; People v. Wyman, 102 Cal. 552, 36 P. 932, 934; State v. Britt, 278 Mo. 510, 213 S.W. 425, 427; Prinslow v. State, 140 Wis. 131, 121 N.W. 637; State v. Ross, 55 Or. 450, 104 P. 596, 604, 106 P. 1022, 42 L.R.A., N.S., 601; People v. Hatch, 163 Cal. 368, 125 P. 907.

We find that the demurrer to the evidence should have been sustained.

There are other errors in the record, and particularly involving the instructions, but by reason of the view we have arrived at in this case, we find it unnecessary to discuss the other propositions raised.

The case is reversed and remanded.

JONES and BRETT, JJ., concur.